Owen Lee SWAIM, Appellant,

v.

The STATE of Oklahoma, Appellee.

No. F–76–319.

Court of Criminal Appeals of Oklahoma.

Sept. 27, 1977.

James W. Fransein, Robert S. Lowery, Tulsa, for appellant.

Larry Derryberry, Atty. Gen., Douglas L. Combs, Asst. Atty. Gen., for appellee.

## OPINION

BRETT, Judge:

Appellant, Owen Lee Swaim, hereinafter referred to as defendant, was charged jointly with Mark Wynn Osterloh in the District Court, Tulsa County, Case No. CRF–75–2630, with the offense of Murder in the First Degree, in violation of 21 O.S.Supp. 1973, § 701.1, ¶ 2. A severance of trial from Osterloh was granted the defendant who was subsequently tried and convicted of the crime charged. His punishment was fixed at death by electrocution in accordance with the statute. From said judgment and sentence an appeal has been filed with this Court.

From the testimony and evidence presented at trial, the State's case was as follows. On the evening of July 26, 1975, David Perry Lewallen, 19 years of age, borrowed a belt from his father, Raymond Lewallen, prior to leaving home for the evening in his 1973 green Dodge Coronet automobile. According to his father, David Lewallen took with him approximately $200.00 in cash, a ring (State's Exhibit No. 4), which had been in the family for many years, and a 17-jewel wristwatch (State's Exhibit No. 5). Inside Lewallen's car was a Pace side-band citizen band radio, identical to State's Exhibit No. 2.

On Sunday, July 27, 1975, Mrs. Grace Brightman of Wagoner, Oklahoma, went to Mohawk Park in Tulsa at approximately 8:30 a. m. to reserve a shelter for a family reunion. She entered an enclosed picnic pavilion near the boat docks and observed a body covered with blood, naked with arms spread and lying upon a neatly folded quilt blanket. She notified authorities, who determined the body to be David Lewallen.

Dr. Robert Fogel, a forensic pathologist, performed an autopsy on Lewallen's body at 2:00 p. m. on July 27, 1975. He fixed the cause of death as strangulation by ligature.

The victim had also been struck repeatedly about the head after death, shattering his skull into more than 200 fragments and giving it the consistency of "mashed potatoes." He estimated that the victim had died sometime between 8:00 p. m. on July 26, and 4:00 a. m. on July 27.

In the latter part of July, 1975, Allen Joe Osterloh and Fawn Lynn Osterloh, brother and sister-in-law of Mark Osterloh, visited the defendant and Osterloh at defendant's apartment to help bag marihuana for sale. Allen Osterloh refused a request by the defendant that he furnish the defendant and Osterloh an alibi for the night of the homicide.

Defendant and Mark Osterloh—in what was described at trial as a joking manner—conjointly told Allen and Fawn Osterloh how they had decided to "pick up a faggot to roll," in order to get money to pay an apparently drug-related debt. They met the victim at a Tulsa bar frequented by homosexuals. Defendant drove Lewallen's car to Mohawk Park, with Lewallen riding in the front passenger's seat and Mark Osterloh in the back seat.

While Lewallen was preparing to engage, or as actually engaged in sexual activity with the defendant, Mark Osterloh removed his own belt and placed it around Lewallen's head. The belt caught on Lewallen's chin, but defendant pulled it down around the victim's throat. While Osterloh pulled Lewallen from the car with the belt, defendant kicked the victim out with his boot.

The defendant took the belt from Osterloh, put his foot on the victim's head and pulled on the belt. When the defendant released the belt, he got a log and hit Lewallen in the head to make sure he was dead. The defendant and Osterloh dragged the victim into the picnic pavilion, where they stripped the clothes, watch and ring from his body.

The defendant and Osterloh drove Lewallen's car from the park. They abandoned it after removing the CB radio and wiping their fingerprints from it. They subsequently hid some items, taken from the victim, at Lake Keystone.

Defendant showed Allen and Fawn Osterloh a CB radio, and Mark Osterloh told them, "we killed a guy for it." Allen Osterloh offered to buy the radio from the defendant, but the defendant told him, "You don't want this radio."

Allen and Fawn Osterloh testified that they did not believe the story defendant and Osterloh told them about the homicide. Allen Osterloh admitted that he joked about the murder with the defendant and Mark Osterloh because the group often joked about "raping little old ladies and committing fellatio on all kinds of weird people." Each testified to witnessing a group of black youths stealing from the defendant approximately two weeks prior to Lewallen's death, and the defendant telling them that the youths had taken a quantity of marihuana, for which he owed someone approximately $90.00.

Fawn Osterloh identified State's Exhibit No. 4 as the ring Mark Osterloh was wearing when he told her he had taken it from Lewallen's body. She also said State's Exhibit No. 5 resembled the watch Mark Osterloh was wearing. She was unable to identify State's Exhibit No. 2, the citizen's band radio defendant had shown at his apartment.

On August 24, 1975, Arthur Conway purchased a CB radio from the defendant. He identified State's Exhibit No. 2 as the radio which he had given to Investigator Curtis Hanks of the Tulsa Police Department on August 26, 1975. Conway identified State's Exhibit No. 6 as a check for $75.00 which he had given the defendant in payment for the radio. It appeared to have been endorsed by the defendant.

James Neal Summers testified that in early July, 1975, he gave the defendant a quantity of marihuana to sell at the request of the defendant's brother-in-law, Richard Warren. Later that month, Summers attempted to collect money from the defendant for the marihuana, but the defendant told him the marihuana had been stolen. The defendant promised to pay Summers, saying, "he would get the money if he had to cut some old lady's throat."

In early August, 1975, defendant and Mark Osterloh talked with Summers in Warren's home. After Summers and Warren had concluded a marihuana sale, Osterloh showed Summers a ring and a watch. Osterloh told Summers that the items belonged to a "queer" he and the defendant had robbed in Mohawk Park. Summers identified State's Exhibit No. 4 as the ring, and State's Exhibit No. 5 as the watch Osterloh had shown him.

In the latter part of August, Summers contacted the Sand Springs Police Department concerning the homicide. Eventually, Summers told Detective Jack Powell of the Tulsa Police Department of his conversation with the defendant and Mark Osterloh. The information Summers gave Powell included facts about the homicide which the police had not revealed to the public.

Powell, senior investigating officer in the homicide, testified on cross-examination that the blanket upon which the victim was found appeared to have been "laid down purposely and carefully." The victim was completely naked. His shirt, which did not have any blood stains, was neatly folded upon a table approximately 12 to 15 feet away from the body. Also found were the victim's shoes, with the socks inside, and his underwear. The victim's pants were missing.

Powell saw no indications in the dust on the floor of the pavilion that the victim had been dragged, even though the dust was such that footprints could easily be seen. There were no signs of dragging on the victim's heels.

Various witnesses identified State's Exhibit No. 1 (a black and white photograph of the exterior of the picnic pavilion in which the victim was found) and State's Exhibit Nos. 7 and 8 (black and white photographs of the victim's body inside the pavilion) as accurate representations of what they had seen in Mohawk Park on July 27, 1975.

The defense presented Richard Warren, who denied Summers had met with the defendant and Mark Osterloh at his house. Several inmates of the Tulsa County jail also testified as to incidents subsequent to the defendant's arrest and incarceration, all of which are of no importance to this appeal.

The 23-year-old defendant admitted prior felony convictions of second degree burglary and tampering with a motor vehicle and a misdemeanor conviction. He denied being at Mohawk Park the weekend of July 26, 27, 1975, or killing the victim, but admitted having received a citizen band radio from Mark Osterloh the day after the homicide. Osterloh told the defendant that he had gotten the radio from "a queer he had rolled in Mohawk Park."

Defendant identified State's Exhibit No. 2 as the radio which he admitted selling to Conway. He generally confirmed the testimony of Allen and Fawn Osterloh regarding what he and Mark Osterloh had told them about the murder, but claimed they were joking with them. The defendant was unable to account for his actions on the weekend of the homicide.

In rebuttal the State presented testimony regarding the events which occurred after the defendant's arrest, which are of no importance to this appeal.

## I

In view of our ultimate holding in this case, it is unnecessary for this Court to decide defendant's contention that punishment by death is an integral part of 21 O.S.Supp.1973, § 701.1, et seq., requiring this Court to reverse and dismiss this case. However, we refer defendant to the decision in *Riggs v. Branch*, Okl.Cr., 554 P.2d 823 (1976).

It is also unnecessary for us to decide defendant's contention that the court below should not have allowed the State to amend its original information charging second degree murder to a charge of first degree murder.

 Defendant contends that the trial court erred in admitting photographs showing the victim's body as it was found in the picnic pavilion. It is alleged that whatever

probative value the photographs have is outweighed by the gruesome nature of the victim's injuries, thus making them prejudicial to the defendant's right to a fair trial. After reviewing the photographs, this Court cannot find that they were so gruesome and ghastly that the jury would have been inflamed, nor that the trial court abused its discretion in admitting the photographs into evidence. *Pate v. State*, Okl. Cr., 361 P.2d 1086 (1961).

■ Defendant alleges that the conduct of the Assistant District Attorney, including improper comments, appealed to the passion and prejudice of the jury and denied defendant a fair trial. In examining the entire record, this Court finds there were times during the heat of the trial when the prosecutor and defense counsel appear to have exceeded momentarily the accepted bounds of conduct for counsel in a trial. We cannot say, however, that the conduct of either counsel was such that it denied defendant a fair trial. In any case, counsel for the defendant failed to object to the prosecutor's alleged misconduct to preserve it for consideration by this Court. See, *Glazier v. State*, Okl.Cr., 514 P.2d 87 (1972).

In view of the above, defendant's contention that the accumulation of errors and irregularities when considered as a whole deprived him of a fair trial is without merit.

## II

Defendant's remaining contention is that the trial court improperly refused to give his requested instruction on second degree murder. In analyzing this issue, we look first to the legislative histories of 21 O.S. Supp.1973, §§ 701.1, ¶ 2,[1] and 801.[2]

Prior to 1973, Section 801 included the death penalty as one of the possible punishments for committing robbery with firearms or a dangerous weapon. Robbery by force or fear under 21 O.S.1971, § 791,[3] which carried the sole penalty of imprisonment, was a lesser included offense of Section 801. When the Legislature revised Section 801 in 1973, among other things, it removed punishment by death as a penalty and substituted life imprisonment as the maximum sentence.

Seventeen days after Section 801 became law through its emergency clause, the revised murder statutes, Section 701.1, et seq., took effect. Under Section 701.1, ¶ 2, a person convicted of a premeditated murder during the commission of an *armed* robbery was to suffer punishment by death as a mandatory sentence. The mandatory provision was the result of the United States Supreme Court decision in *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), which indicated that "the only constitutional statutory scheme for the imposition of capital punishment was a

---

1. First degree murder includes homicide committed during the commission of an armed robbery under 21 O.S.Supp.1973, § 701.1, ¶ 2, which provides:

 "Homicide, when perpetrated without authority of law and of a premeditated design to effect the death of the person killed, or of any other human being, is murder in the first degree in the following cases:

 \* \* \* \* \* \*

 "2. When perpetrated by one committing or attempting to commit . . . *armed* robbery . . ." (Emphasis added)

2. Robbery with firearms or other dangerous weapon is defined by 21 O.S.Supp.1973, § 801, which provides:

 "Any person or persons who, with the use of firearms or any other dangerous weapons, whether the firearm is loaded or not, or who uses a blank or imitation firearm *capable of raising in the mind of the one threatened*

with such device a fear* that it is a real firearm, attempts to rob or robs any person or persons, or who robs or attempts to rob any place of business, residence or banking institution or any other place inhabited or attended by any person or persons at any time, either day or night, shall be guilty of a felony, and upon conviction therefor, shall suffer punishment by imprisonment for life at hard labor, in the state penitentiary, or for a period of time of not less than five (5) years, at the discretion of the Court, or the jury trying the same." (Emphasis added)

3. Robbery by force or fear is defined by 21 O.S.1971, § 791, which provides:

 "Robbery is a wrongful taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear."

scheme wherein no discretion existed." *Riggs v. Branch*, supra.

When considered in the context of the *Furman* case it is clear to this Court that the legislative intent in revising the penalty provision of Section 801 and enacting Section 701.1, ¶ 2, was to insure that the only persons who suffer punishment by death for *armed* robbery will be those individuals who take a human life while in the commission · of a robbery which falls within the prohibition of Section 801, i. e., through the use of a firearm or other dangerous weapon.

 When viewed in the above context, it is clear to this Court that by the specific use of "armed" as a limiting adjective to the element of robbery under Section 701.1, ¶ 2, the Legislature did not intend to include all forms of robbery—i. e., robbery by force or fear under Section 791 —within the first degree murder statute. It appears to this Court that a homicide which occurs during robbery by force or fear is within the statutory prohibition of second degree murder, 21 O.S.Supp.1973, § 701.2, ¶ 3,[4] which is punishable by an indeterminate sentence from ten (10) years to life imprisonment.

 The question which this Court must decide in the case at bar is whether a belt is a dangerous weapon under the particular facts of this case, within the meaning of *armed* robbery. After much consideration, it is the opinion of this Court that it was not a dangerous weapon.

Since the instrument used by the defendant in the robbery was not a dangerous weapon under the particular facts of this case, he could not be guilty of first degree murder as there was no armed robbery within the meaning of Section 701.1, ¶ 2. Therefore, the defendant was entitled to his requested instructions on second degree murder because the State's evidence establishes that he was guilty only of second degree murder.

---

4. Second degree murder is defined by 21 O.S. Supp.1973, § 701.2, ¶ 3, which provides:
 "When perpetrated without any design to effect death by a person engaged in the com-

In reviewing the record, we find there is overwhelming evidence upon which the jury found the defendant responsible for the victim's death. In view of this overwhelming evidence, it is unlikely that a jury on retrial would fail to find the defendant guilty of second degree murder. As the defendant sought an instruction on second degree murder, it is the judgment of this Court that the judgment and sentence herein appealed be *MODIFIED* and returned to the trial court below with instructions to modify the sentence to reflect a second degree murder conviction with an indeterminate sentence from ten (10) years to life imprisonment. *Short v. State*, Okl.Cr., 560 P.2d 219 (1977).

For all the above and foregoing reasons, the judgment and sentence herein appealed from is, accordingly, *AFFIRMED* as *MODIFIED*.

BUSSEY, P. J., concurs.

mission of any felony other than the felonious acts set out in Section 1 of this act."