**Mark Hamilton TOBLER, Appellant,**

v.

**STATE of Oklahoma, Appellee.**

No. F–82–304.

Court of Criminal Appeals of Oklahoma.

Sept. 10, 1984.

Thomas G. Smith, Jr., Asst. Public Defender, Norman, for appellant.

Michael C. Turpen, Atty. Gen., Susan Brimer Agosta, Asst. Atty. Gen., Oklahoma City, for appellee.

## OPINION

PARKS, Judge:

Mark Hamilton Tobler was convicted of two counts of First Degree Murder in the District Court of Stephens County, and was sentenced to death.

On August 14, 1981, the bodies of two brothers, Carroll and Paul Hayden, were found in their Duncan, Oklahoma residence. The men had been shot to death by contact or near contact blasts to the head from a twenty-two caliber weapon. The corpses were on the beds in the men's respective bedrooms, and were in an advanced state of decomposition. They were found five days after death in the sealed, un-air-conditioned house.

During their on-scene investigation, police discovered a diary in the bedroom of Paul Hayden. An entry for August 3, 1981 indicated the brothers had picked up a man named "Mark," who was going to stay with them for a few days. Police also determined that a man named "Mark H. Tobler" had sold a watch to a Duncan pawnshop on August 4, 1981.

The victims' had visited the home of friends on August 6, 1981 with a third man described to a police artist and identified at trial as the appellant. These same friends went to call on the victims on the afternoon of August 9, 1981. They got no response to their knocks at the door, and noticed that the victims' Impala was gone. Believing that the brothers had begun a long-planned trip to Michigan, the friends did not suspect trouble.

Carroll's Chevrolet Impala was found near the Red River in the vicinity of Davidson, Oklahoma. Attention began to focus on appellant, a resident of Texas. Fingerprints found in the bedrooms of the victims matched those of the appellant. A material witness warrant was issued, and Oklahoma investigators interviewed appellant at the Huntsville, Texas police station on September 25, 1981. In three conflicting stories given the the investigators, appellant acknowledged staying with the Haydens for several days in the first of August while job hunting in this state, but indicated surprise at the news of the deaths. However, that same evening, after returing to Duncan with the investigators, appellant told a fourth story admitted killing the men at about 3:30 or 4:00 a.m. on the morning of August 9, 1981. This story was essentially the same as the testimony appellant gave at trial.

The state's theory of prosecution was murder for the purpose of robbery. The victims had cashed checks totalling over $1,200 during the week before their death, but the victims' trouser pockets and wallets were empty. Dresser drawers in Carroll's bedroom were scattered about the floor, and Carroll's car was missing. Appellant tried to explain the missing money by showing the brothers had purchased a pound of marijuana on the day before their death, and had their car serviced a few days earlier at a cost of over $100.

Appellant insisted he had killed the Haydens because they had forcibly sodomized him at gunpoint earlier that evening. He admitted waiting about three hours after the attack so the victims would be asleep when he killed them. He claimed he killed the men out of anger over the attack and fear that it would be repeated. He also admitted taking the victims' car, the pound of marijuana, and some money found on a dresser. He said he felt this was "owed" to him for what they had done.

Appellant's Dallas, Texas roommate testified that appellant was to have paid the entire August rent, and had gone to Oklahoma to work. He said appellant returned to Dallas in early August with enough money to pay the $365 rent payment with about $50 remaining. He said appellant was driving a Chevrolet Impala with Oklahoma tags containing various articles of property, most of it boxed, and most later identified as the property of the victims. Appellant claimed the property was already

loaded in the car when he took it in anticipation of the impending trip to Michigan.

At trial, appellant offered evidence to suggest that the victims were homosexual. He denied ever having homosexual relations himself. He insisted that the slayings were the product of the alleged homosexual rape, and denied that they were related to the theft of the victims' property. The state offered rebuttal evidence.

The jury convicted appellant of two counts of first degree murder in the first stage of trial. In the second stage, they found the existence of two of the three aggravating circumstances instructed upon by the judge: That the defendant knowingly created a great risk of death to more than one person, 21 O.S.1981, § 701.12(2); and that there existed a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society, 21 O.S.1981, § 701.12(7). The jury failed to find that the murders were committed for the purpose of avoiding or preventing arrest or prosecution, 21 O.S.1981, § 701.12(5). They determined that appellant should be punished by death, and judgment and sentence was entered accordingly.

On appeal, appellant presents twelve assignments of error. However, we will discuss only the first and last of those as we are reversing this case and remanding for a new trial, and all but one of the remaining propositions deal exclusively with the death sentence.

## I.

█ In his first and twelfth assignments of error, appellant contends that he was denied a fair trial because of numerous instances of prejudice at trial. We agree.

█ We note at the outset, that virtually none of the instances of prejudice were objected at trial.[1] Thus, we can only review these allegations of error if they are fundamental. *Tucker v. State*, 675 P.2d

459 (Okl.Cr.1984). We have defined "fundamental errors" as those "which to to the foundation of the case, or which take from the defendant a right which was essential to his defense." *Id.* at 461. We will review these assignments of error because there is no right which is more essential to an accused's defense than the right to a fair trial free from prejudice.

In this case, the sheer volume of prejudicial remarks, witnesses and exhibits, makes it clear that appellant did not receive a fair trial. The behavior of District Attorney Tony R. Burns can only be termed outragious. The conduct designed to prejudice appellant in this trial began during voir dire and continued through the closing argument in the sentencing phase. It generally falls into six categories: 1) Pleas to the jury to have sympathy for the victims; 2) Unfair characterizations of appellant; 3) Irrelevant and prejudicial testimony; 4) Conclusive and rhetorical questions; 5) Photographs and descriptions of the decomposed bodies of the victims; and 6) The prosecutor aligning himself with the jury and the public, and thereby making statements of law.

## II.

Mr. Burns began pleading for sympathy for the victims during vior dire when he asked the entire jury panel:

"[W]ill everyone of you promise that everytime you think of Mr. Tobler and his rights under the laws of our land, that you'll also turn that coin over and you'll think about the two victims of this crime, Paul and Carroll Hayden? Will each of you do that for me?"

(Transcript Page 41).

This question was again asked of each juror individually during the course of voir dire. This plea was reasserted with renewed vigor during the prosecutor's closing arguments. After comparing the appellant's and victims' ages, and stating that

---

1. This fact is a principal basis for appellant's second assignment of error; ineffective assistance of counsel. But, as the issue of prejudice is dispositive, we will not reach the question of counsel's effectiveness in this opinion.

the victims worked for a living and appellant did not, the prosecutor said:

"...when you look over here and you see any sympathy about the age of this Defendant, I'd sure like for you to remember the two people that you see in Defendant's Exhibit Number 2. [Photo of Victims] ... You talk about sympathy in the case, you told me you would look at both sides of the coin when you made a determination."

■ We have repeatedly stated that it is improper for prosecutors to ask jurors to have sympathy for victims. *Williams v. State*, 658 P.2d 499 (Okl.Cr.1983). In *Scott v. State*, 649 P.2d 560 (Okl.Cr.1982), we called such attempts to invoke sympathy by this same prosecutor "reprehensible." Furthermore, such appeals are violative of *The ABA Standards for Criminal Justice*, § 3–5.8(c) (1980), adopted by this court in *Dupree v. State*, 514 P.2d 425 (Okl.Cr.1973) and *Ray v. State*, 510 P.2d 1395 (Okl.Cr. 1973).

■ The standards provide:

"(c) The prosecutor should not use arguments calculated to inflame the passions of prejudices of the jury."

While zeal is an admirable quality in a prosecutor, he or she must not lose sight of his or her function defined in the ABA Canons of Professional Responsibility:

"The primary duty of a lawyer engaged in public prosectuion is not to convict, but to see that justice is done."

5 O.S. Ch. 1, App. 3, Canon 5 (1961).

■ The prosecutor further evoked sympathy via testimony from the victims' brother. He was called, ostensibly to assert his brothers' heterosexuality. However, while on the stand, he described the victims' last visit to their parents' home. He told of their mother's reaction to the Mother's Day surprise, and how happy the whole family was. This testimony had no relevance, and was clearly designed to create sympathy from the jurors.

### III.

Throughout the trial, the prosecutor made repeated derogatory characterizations of appellant, calling him a "doper," a "marijuana expert man," and "the homosexual that came into your community." Referring to allegations that appellant had sexually abused a mentally retarded neighbor, he said, "There is nothing worse in our society than that," and that appellant "prey[ed] on a retarded person." In closing argument during sentencing phase, the prosecutor listed on a blackboard several "characteristics" of appellant, including "transient," and "hitchhiker," among others already mentioned. Such name calling and characterizations have never been permitted by this court. See e.g. *Robinson v. State*, 574 P.2d 1069 (Okl.Cr.1978), and *Lewis v. State*, 569 P.2d 486 (Okl.Cr.1977).

### IV.

■ The most damaging and prejudicial errors were the frequent allegations that appellant is homosexual, and testimony to that effect. A great deal of time was spent at trial discussing whether appellant is or is not a homosexual, including a witness whose primary purpose was to show appellant's homosexuality. However, we find not a semblance of relevance to that discussion. The prosecutor apparently believed that calling appellant a homosexual would negate his defense of having been forcibly raped. We certainly cannot permit the inference that a person's sexual orientation toward members of his or her own sex cancels the right to be free from forcible rape. The prosecutor may also have been trying to advance a theory that appellant had, in actuality, propositioned the victims and been rebuked, but that theory is purely speculative and is not supported by *any* evidence. The conclusion is clear that allegations of appellant's homosexuality served no probative purpose whatever, and only served to inflame the jury.

### V.

The prosecutor asked several conclusory and rhetorical questions when examining

witnesses and cross-examining appellant. When questioning a police officer about the possible presence of stolen property in the victims' house, the prosecutor asked:

"Q  The only person that said those types of things about the Hayden's was the same man that murdered them.  Is that correct?"

(Transcript page 585).

Further, when cross-examining appellant, the prosecutor asked several questions that were argumentative or impossible to answer.  Some examples are:

"Q  Was there—was there sperm in the anus of Carroll and Paul Hayden, placed here by you?

A  No, Sir.  It wasn't.

Q  With two men, young men that were healthy, that were workers, what's the only way you could overcome two men like that and do what you wanted to do?

A  I guess by a gun.

Q  You kill them and do what you wanted to couldn't (sic) you?

A  I guess so.

(Transcript page 718).  (The medical examiner had already testified that the decomposition of the victims' bodies precluded any evidence of sexual activity).

Q  You know, this is part of the allegation that this was a premeditated and planned murder.  That's exactly what you did isn't it?

A  No, sir.  It wasn't.

Q  If you're thinking about murder before you do it, that's called premeditation, malice aforethought.  You planned it ahead didn't you?

(Transcript page 719).

Q  You, Mr. Tobler—there is—Paul and Carroll Hayden have no way of defending themselves.  They're dead. You have defamed two dead men and accused them of something.  If it had been two dead women in that house, I suppose they would have been lesbians and they would have tried—they would have forced you at gunpoint to do things to you too?"

(Transcript pages 747–748).

▨  For obvious reasons, prosecutors should be given a certain latitude in their examination of witnesses, and particularly, cross-examination of defendants.  However, we have recognized that the latitude has outer limits.  See e.g. *Robinson v. State*, 574 P.2d 1069 (Okl.Cr.1978), *Barham v. State*, 514 P.2d 417 (Okl.Cr.1973), and *Chase v. State*, 541 P.2d 867 (Okl.Cr. 1975).  Moreover, the behavior of the prosecutor in this case exceeded the guidelines in *The ABA Standards for Criminal Justice*, § 3–5, 7(a)(d) (1980):

"(a) The interrogation of all witnesses should be conducted fairly, objectively, and with due regard for the dignity and legitimate privacy of the witness, and without seeking to intimidate or humiliate the witness unnecessarily.  Proper cross-examination can be conducted without violating rules of decorum.

(d) It is unprofessional conduct for a prosecutor to ask a question which implies the existence of a actual predicate for which a good faith belief is lacking."

An examination of the entire record, of which the foregoing quoted questions are only examples, indicates the prosecutor in this case exceeded the scope of propriety.

## VI.

The prosecutor introduced at trial evidence of the advanced state of decomposition of the victims' bodies both in testimony and photographs.  The photographs depict the gruesome work of nature under the extreme conditions present.  The officers testified to their sensory perceptions upon finding the bodies, including the stench, the appearance, and even the sound of the maggot activity in the bodies.

▨  Our evidence code requires evidence to be excluded from trial when its probative value is exceeded by the danger of unfair prejudice.  12 O.S.1981, § 2403. It is difficult to ascertain any probative value of the evidence.  Appellant had ad-

mitted to the killings, the medical examiner testified as to the cause of death, and appellant stipulated to everything shown by the photos. The details of the condition of the bodies provided nothing in the way of new evidence, and had the potential, if not certain, effect of unduly prejudicing appellant. Therefore, the evidence should have been excluded. This, of course, does not mean that crime scene photos are per se excludable because they are gruesome; that decision is discretionary with the trial court. *Cooper v. State*, 661 P.2d 905 (Okl. Cr.1983). However, when the photos are merely cumulative as they are here, that fact must enter into the probative/prejudice balance.

## VII.

■ Finally, the prosecutor aligned himself with the victims and the state during his closing argument. In his "capacity" as a representative of the state, the prosecutor's last statement to the jury during the guilt phase was:

"Ladies and Gentlemen, if you're going to find Mark Tobler guilty of Manslaughter in the First Degree, then acquit Mark Tobler. Let him go, and when you vote not guilty, when you—if you think it is just manslaughter, then you just acquit him right now. I'm the representative of the State and I'm just asking you to do just that, and when you vote that way, then you remember the last statement of Mark *Tabler* (sic) from that witness stand. I'll do it again, or I did— I'd do it again. You remember that, Ladies and Gentlemen. It's Murder in the First Degree. Thank you.
(Transcript page 835).

This is a clear attempt to persuade the jury away from following the judge's instruction on manslaughter, which is something we have long disapproved of. As far back as *Hau v. State*, 234 P.649 (Okl.Cr. 1925), we held:

"...It is not for county attorneys to declare the law to the jury. That is the duty of the court, and the county attorney is as much bound by the law, as

declared by the court, as are the jury and the defendant. That this misstatement of the law was prejudicial to the defendant cannot be doubted."
*Id.* at 650.

This position was reaffirmed more recently in *Frazier v. State*, 607 P.2d 709 (Okl.Cr. 1980).

The incidences of prejudice mentioned here are merely representative samples. In fact, the record is replete with thinly veiled, or in some cases, unveiled, attempts to induce the jury to decide the case based on emotional reactions. Of course, we have always held that prosecutors have a broad freedom of speech and range of discussion, *Wacoche v. State*, 644 P.2d 568 (Okl.Cr.1982), and any one of these errors, by itself, may not have created prejudice, but the cumulative effect of the entire record gives a very clear indication that this case requires reversal. We have reversed for much less. See e.g. *Grubb v. State*, 663 P.2d 750 (Okl.Cr.1983). The jury's recommendation of the death penalty despite the evidence of provocation further reinforces our conclusion.

For the foregoing reasons, this case will be **REVERSED** and **REMANDED** for new trial, notwithstanding the dearth of objections throughout.

BRETT, J., concurs.

BUSSEY, P.J., dissents.

BUSSEY, Presiding Judge, dissenting:

By his own admission the defendant shot and killed Carroll and Paul Hayden, as they lay sleeping in their beds, stole an automobile and personal property belonging to them and, when first questioned by police, denied any knowledge of their deaths. It is obvious that the jury disbelieved the defendant's testimony that *he* was the victim of a homosexual attack by the decedents, but found instead that his motive for killing the sleeping brothers was robbery.

The evidence presented at trial amply supports the jury's finding of the two aggravating circumstances.

The photographs of which the defendant now complains were properly admitted. They were part of a group of six offered by the State, the judge sustained defense objections to the other three pictures. The photos admitted depicted the back of the head of Carroll Hayden, and his shoulders and arms, as he lay face down in bed; and two views of the lower legs of Paul Hayden, as he also lay in bed. The pictures were not particularly gruesome, and supported the State's theory that the men were slain as they lay sleeping in bed. Moreover, the pictures of Paul Hayden reveal a spent shell casing on the bed near the body, bolstering the State's evidence that he was shot at very close range.

Neither the unobjected to conduct of the prosecutor, nor the alleged ineffective assistance of defense counsel so prejudicially influenced the verdict of the jury as to require reversal, when measured by the statndards set forth by this Court in *Tucker v. State*, supra, and the United States Supreme Court in *Strickland v. Washington*, 466 U.S. ——, 104 S.Ct. 2052, 80 L.Ed.2d 674, 1984.

I would affirm the judgment and sentence.