**Dale Dewayne LIVINGSTON, Appellant,**

v.

**STATE of Oklahoma, Appellee.**

**No. F–94–908.**

Court of Criminal Appeals of Oklahoma.

Nov. 14, 1995.

David R. Poplin, Vinita, for Defendant at trial.

Clint Ward, Assistant District Attorney, Vinita, for State at trial.

Mary S. Bruehl, Appellate Defense Counsel, Norman, for Appellant on appeal.

W.A. Drew Edmondson, Attorney General of Oklahoma, Alecia A. George, Assistant Attorney General, Oklahoma City, for Appellee on appeal.

## OPINION

CHAPEL, Vice Presiding Judge.

Dale Dewayne Livingston was tried by a jury and convicted of First Degree Murder in violation of 21 O.S.1991, § 701.7, in the District Court of Craig County, Case No. CRF–94–10. In accordance with the jury's recommendation, the Honorable Bill M.

Shaw sentenced Livingston to life imprisonment without possibility of parole. Livingston has perfected his appeal from this conviction.

Livingston raises four propositions of error on appeal. Error in Proposition I requires reversal of the judgment and remand of the case for a new trial. We also address error in Propositions II and III. We do not address Proposition IV.

In the early morning of October 26, 1991, Floyd Dee Taylor was burned to death while sitting on a couch in his girlfriend's house. Nobody else was injured and evidence indicates Taylor was alone. The fire started after approximately 2:10 a.m.; the fire department was called at 2:32 a.m. Gasoline was splashed on Taylor, the couch, and the floor nearby. The cause of death was asphyxiation by carbon monoxide and smoke inhalation. Testimony showed the body was largely incinerated—Taylor's left forearm and hand were missing, his left leg was consumed and part of it fell to the floor, his right leg and skull were charred to the bone, and a portion of his abdomen was so burned that internal organs were exposed. Taylor's back was less burned; he was identified at the scene from papers in the wallet found in his back pocket. Dental records confirmed his identity.

Taylor had been seeing Joanne Bergman, Livingston's ex-wife, and planned to move in with her on October 27, 1991. Livingston often said he believed Taylor prevented him from reconciling with Bergman. Although Livingston did not threaten Taylor's life, it was common knowledge that the two did not get along. Around midnight on October 26, 1991, Livingston and Taylor entered the Gobbler bar together. The two did not appear to be fighting. Livingston stayed until approximately 1:45 a.m., while Taylor left about 12:15. Taylor got a ride to Bergman's house from his sister's boyfriend, Shawn Docherty. Taylor told Docherty he had been drinking with Livingston and they were getting along fine. Docherty saw Taylor enter Bergman's

empty house alone. Livingston arrived at his home sometime after 2:10 a.m. He had been drinking but did not smell of gasoline or smoke.

In March or April of 1993 Bergman found an undated note written by her son, S.L. The note said "[M]y dad told me that he hired a man to kill dee [sic], and that the man left town after doing so." Bergman talked to S.L. and contacted the OSBI. Officer Hicks talked to S.L. in August, 1993. S.L. testified that he wrote the note in December, 1992, and that on October 26, 1991, Livingston told S.L. he had taken care of his problem with Dee by burning S.L.'s mother's house down with Dee in it. S.L. admitted he made up the parts of the note about hiring a man and the man leaving town.

In December 1993, Hicks talked to Lisa Riley, Livingston's girlfriend in early 1992. She said that after several denials Livingston told her in February, 1992, he shot and burned Taylor (no medical evidence indicated Taylor was shot). A private investigator from the television show "Case Closed" contacted Riley; she spoke with Hicks after talking to the investigator.

On January 4, 1994, Livingston told police he planned to beat Taylor up if he saw him October 25, but ended up drinking with him instead. Livingston said that he would probably go to prison for the crime, that he had not done it, and that he hoped his talk about having Taylor beat up had not caused someone else to commit the crime.

 In Proposition I Livingston correctly claims an actual conflict of interest deprived him of the effective assistance of counsel. The most damaging witness against Livingston was his son S.L., who said Livingston told him he killed Taylor.[1] During the time S.L. accused Livingston, S.L. was adjudicated a juvenile on charges of lewd molestation and obscene telephone calls. Livingston did not support S.L. and testified against him in the juvenile adjudication proceedings. At a

---

1. The State emphasized this in closing when it argued that Livingston's own son, "his flesh and blood," testified against him. Riley also testified to an out-of-court admission of guilt, but in her account Livingston admitted killing Taylor several months after the crime, after first denying committing the crime. Riley's description of the crime did not match medical evidence. She only spoke to the OSBI after talking to television show investigators.

pretrial motions hearing Livingston's counsel indicated he wanted to cross-examine S.L. about these juvenile adjudication proceedings and his psychological condition at the time. He intended to impeach S.L. by showing S.L.'s bias against his father and his motive to testify. Unfortunately this line of cross-examination was not pursued because Livingston's trial counsel, David R. Poplin, had represented S.L. in his juvenile proceeding.

The record shows the trial court and the State were both aware of the conflict. Poplin admitted that he had used confidential information he obtained while representing S.L. during the motion hearing; he assured the trial court the confidential information would not be brought up before a jury. Poplin further insisted that he had a right to cross-examine S.L. on the bias issue.[2] The trial court noted that (1) Poplin had established an attorney-client relationship with S.L. and (2) Poplin apparently used information gained in the course of that representation in this case. The trial court asked Poplin how he could defend Livingston to the absolute bounds of the law without crossing over into S.L.'s privilege—the same privilege that was based on Poplin's prior representation in the very subject on which he wanted to cross-examine. Poplin offered to withdraw. He could not remember having any personal pretrial conversations with S.L. during the juvenile proceedings. Poplin said he learned of S.L.'s juvenile record and psychological record when he represented him in the trial, and claimed that in any event he should have received that information in discovery. The State recognized that Poplin had a conflict but suggested that it could be resolved if Poplin was not allowed to impeach S.L. with his juvenile case. Poplin pointed out that would deprive Livingston of full and complete representation.

The trial court appeared to find that S.L. was not prejudiced in these proceedings because, as Poplin knew S.L. was adjudicated a juvenile, that was not relevant to this case. The trial court's comment does not appear to refer to Livingston or his rights. The comment is stunning in light of the court's clear recognition of a conflict and the court's subsequent decision to leave to Poplin the question of whether he could represent Livingston to the bounds of the law and cross-examine S.L. in that light without crossing the line of privilege. Poplin replied "[I]f I don't go into the facts of that case, I don't see how that could be a conflict." The trial court made no formal ruling.

■ The highlighted statement should have warned Poplin to reconsider. Poplin explicitly agreed to refrain from cross-examining a key State witness in a highly relevant area of bias solely because such questioning would result in an ethical dilemma for him. Poplin owed both Livingston and S.L. a duty of loyalty, including a duty to protect confidences and a duty to avoid conflicts of interest.[3] Regarding conflict of interests through joint representation, it is settled that where a defendant raises no objection at trial but demonstrates on appeal that an actual conflict adversely affected his attorney's performance, prejudice will be presumed.[4] This principle extends to "*any* situation in which a defendant's counsel owes conflicting duties to the defendant and some other person."[5] An

2. The trial court had ruled Poplin could ask S.L. if he was biased because Livingston did not support him when he was charged with juvenile offenses, but could not cross-examine him on the substance of the offenses. This ruling will be discussed in Proposition II. Even if Poplin were required to abide by this ruling, he could have used other avenues to reach the same area of bias. Instead he abandoned the attempt. Poplin also initially asked to use records of S.L.'s psychological examinations to show bias, but withdrew the request after the discussion of conflict of interests.

3. *Allen v. State*, 874 P.2d 60, 63 (Okl.Cr.1994); *Strickland v. Washington*, 466 U.S. 668, 688, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674 (1984). In *Allen* this Court reversed a case where trial counsel had previously represented a person initially accused of the crime with which defendant was charged. *Allen* contains a thorough discussion of the principles outlined here. Although Livingston relies on *Allen*, the State's response does not acknowledge the case.

4. *Allen*, 874 P.2d at 63–64; *Ellis v. State*, 795 P.2d 107, 110 (Okl.Cr.1990); *Cuyler v. Sullivan*, 446 U.S. 335, 349–50, 100 S.Ct. 1708, 1718–19, 64 L.Ed.2d 333 (1980).

5. *Allen*, 874 P.2d at 63; *Ellis*, 795 P.2d at 110; *Church v. Sullivan*, 942 F.2d 1501, 1512 (10th Cir.1991); *United States v. Winkle*, 722 F.2d 605,

actual conflict of interest exists where the interests of an attorney and a defendant diverge with respect to a material factual or legal issue **or to a course of action.**[6]

Discussing conflict of interests in the context of joint representation, the Supreme Court states the potential evil lies in what an advocate may find himself compelled to refrain from doing.[7] The Tenth Circuit extends this principle to situations in which defense counsel previously represented a state witness.[8] In another case the Tenth Circuit states that, where trial counsel previously represented a state witness in a case with a factual relationship to the pending criminal case, the primary concern is that counsel may not effectively cross-examine the witness for fear of divulging privileged information.[9] An actual conflict will arise where counsel is unable to effectively cross-examine a state witness because counsel also represented that witness.[10]

The record shows an actual conflict of interest existed here: Poplin was unable to effectively cross-examine S.L. to show bias without using information he gained while previously representing S.L. S.L.'s juvenile adjudications were factually related to this case to show bias because Livingston sought to show his conduct during S.L.'s juvenile proceedings biased S.L. against him and gave S.L. a motive to testify against him. Poplin was forced, for personal ethical reasons, to choose a course of action which was not in Livingston's best interest. Livingston had the right to an attorney who could fully explore the question of S.L.'s bias and motive for testifying. Poplin voluntarily abandoned any meaningful cross-examination on that issue. Consequently a key state witness's pos-

sible bias was not explored for the jury. This actual conflict of interest adversely affected Poplin's performance in Livingston's case; it prevented him from effectively cross-examining and possibly exposing the bias of an important state witness. We presume prejudice from this adverse effect and reverse the case. Livingston should be represented by counsel free from conflict in any further proceedings.

■ In Proposition II Livingston correctly claims his Sixth Amendment right to confrontation was violated when the trial court limited his cross-examination of S.L. The court ruled Livingston could ask S.L. whether he was biased because Livingston did not support him when he was charged with juvenile offenses, but could not question S.L. about the subject matter of those offenses or introduce records of S.L.'s contemporary psychological examinations (Poplin agreed to the former ruling and withdrew the latter request). This limitation did not offer Livingston a meaningful opportunity to cross-examine S.L. for bias. The court allowed Livingston to ask whether S.L. was biased without allowing counsel to "make a record from which to argue *why* [S.L.] might have been biased *or* otherwise lacked that degree of impartiality expected of a witness at trial;" an effective inquiry would have permitted counsel to give the jury the facts from which they could draw inferences relating to S.L.'s credibility.[11] The State essentially concedes this argument by failing to address any of the controlling cases discussed below.

■ Exposure of a witness's motive to testify is a proper and important function of

609–10 (10th Cir.1983); *Wood v. Georgia*, 450 U.S. 261, 268–72, 101 S.Ct. 1097, 1101–03, 67 L.Ed.2d 220 (1981). The State cites Ninth and Eleventh Circuit cases to suggest that it is harder to prove an actual conflict of interest in cases of successive representation. The Tenth Circuit specifically addressed this question in *Church* and rejected the suggestion, noting that this reasoning is inconsistent with the Tenth Circuit law of *Winkle* and *United States v. Bowie*, 892 F.2d 1494, 1501 (10th Cir.1990).

**6.** *Cuyler v. Sullivan*, 446 U.S. at 356, n. 3, 100 S.Ct. at 1722, n. 3 (Marshall, J., concurring in part and dissenting in part).

**7.** *Holloway v. Arkansas* 435 U.S. 475, 490, 98 S.Ct. 1173, 1182, 55 L.Ed.2d 426 (1978).

**8.** *Winkle*, 722 F.2d at 610.

**9.** *Bowie*, 892 F.2d at 1501.

**10.** *Winkle*, 722 F.2d at 610.

**11.** *Davis v. Alaska*, 415 U.S. 308, 318, 94 S.Ct. 1105, 1111, 39 L.Ed.2d 347 (1974).

cross-examination.[12] This Court has held that bias is never collateral and the right to impeach for bias is construed liberally; a witness may be cross-examined on any matter tending to show bias or prejudice.[13] When determining whether evidence of bias should be admitted for impeachment, the trial court should determine (1) whether the facts are such that the showing of bias for impeachment is relevant under 12 O.S.1991, § 2401; (2) if the evidence is admissible under 12 O.S.1991, § 2402; and (3) if admissible, whether the evidence should still be excluded under 12 O.S.1991, § 2403.[14] The record does not indicate the trial court made these determinations in this case.

In *Davis v. Alaska*,[15] the Supreme Court held that juvenile records may be used to impeach a witness by cross-examination designed to reveal bias, prejudice, or motive to testify. This Court adopted *Davis* in *Bowman v. State*.[16] We refused to grant relief in *Bowman* because: (1) the record did not show whether the evidence was offered as a general attack on a witness's credibility or specifically to show partiality; (2) the record did not indicate that the witness had a juvenile record which could be used for impeachment; and (3) the trial court did not actually prohibit use of the evidence, and the defendant neither renewed his objection nor made an offer of proof.[17] Here, (1) Livingston specifically offered the evidence to attack S.L.'s partiality by showing bias and motive to testify; (2) the trial court took judicial notice of S.L.'s juvenile record and both attorneys were familiar with it; (3) the trial court actually prohibited use of the evidence and counsel voluntarily agreed to this prohibition in a vain attempt to remove a conflict of interest. Under *Davis* and *Bowman* this

evidence should have been admitted, and the trial court's erroneous limitation deprived Livingston of his right to confrontation.

■■■ This error is subject to harmless-error analysis. We must ask "whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt."[18] Upon review of the record, we cannot say so. S.L.'s testimony was of paramount importance to the State's case. It was not cumulative. No other witness testified that Livingston confessed on the day of the crime. S.L. testified Livingston voluntarily said he killed Taylor, while Riley said he denied committing the crime several times before confessing. The only evidence corroborating S.L.'s testimony on material points was the fact that Taylor was burned in Bergman's house and Riley's statement that several months later Livingston said he shot and burned Taylor. Livingston was not allowed to cross-examine S.L. fully on the circumstances in which he wrote the note or his possible reasons for testifying. Finally, the prosecution's case was not overwhelming, as it consisted entirely of circumstantial evidence of motive and opportunity plus two out-of-court admissions of guilt from two witnesses who admitted they hated and feared Livingston. No witness saw Livingston near the scene or saw any indication he had been near a fire that evening. This Court cannot say under these circumstances that this error was harmless beyond a reasonable doubt.

■■■ In Proposition III Livingston claims the trial court erred in admitting two photographs of Taylor. Livingston objected vehemently to these photographs at trial and has

**12.** *Beck v. State*, 824 P.2d 385, 388 (Okl.Cr. 1991); *Delaware v. Van Arsdall*, 475 U.S. 673, 678–79, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986).

**13.** *Beck*, 824 P.2d at 388–89.

**14.** *Id.* at 389.

**15.** 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974).

**16.** 585 P.2d 1373 (Okl.Cr.1978), *cert. denied*, 440 U.S. 920, 99 S.Ct. 1243, 59 L.Ed.2d 471 (1979). The State mistakenly suggests that 12 O.S.1991,

§ 2609(D), governs admissibility of juvenile records for bias. That statute refers only to impeachment by evidence of conviction of a crime. *Van Arsdall, Davis, Beck*, and *Bowman* all clearly allow the admission of juvenile records to show bias.

**17.** *Bowman*, 585 P.2d at 1376.

**18.** *Van Arsdall*, 475 U.S. at 684, 106 S.Ct. at 1438.

preserved this issue for review. State's Exhibits 1A and 1B are front and back views of Taylor's body laid out on a morgue table. The pictures provoke an immediate visceral reaction: their subject resembles a human being just enough to be profoundly disturbing. They show a charred, cracked figure with areas of red, subcutaneous yellow, and bone. The absence of some limbs, and the heavy charring around the stumps and barely recognizable skull, are particularly perturbing.

These photographs were not necessary to the State's case. The medical examiner did not rely on these photographs when presenting his testimony. The doctor who observed Taylor's corpse at the scene did not rely on them, and they did not represent the corpse as he viewed it. The cause of death, proved by two witnesses, was not incineration (as depicted by the photographs) but asphyxiation by carbon monoxide poisoning and smoke inhalation.[19] In addition to several photographs of the burned house, two small color photographs of the body at the scene were admitted without objection. Livingston contested neither the cause nor method of death and did not contest the use of accelerants on the body, all of which were proved by other photographs and testimony.

■■■ Photographs of a corpse may be admissible, among other reasons, to show the nature, extent and location of wounds, to show the crime scene, or to corroborate the medical examiner's testimony.[20] Otherwise relevant photographs should not be admitted if the danger of prejudice substantially outweighs their probative value.[21] This Court has remarked that gruesome crimes make gruesome photographs and has held that the question is whether the photographs are so unnecessarily hideous as to produce an unfair impact on a jury.[22] We have also held that, while gruesome or unpleasant, photographs were not so repulsive as to be inadmissible.[23] We have held that photographs may be merely cumulative or so duplicative that needless repetition may inflame the jury.[24] This language indicates that some photographs will not be admissible because they are so hideous or repulsive the jury is unable to view them impartially. These exhibits are so hideous and repulsive that they provoke an immediate, prejudicially emotional response.

■■■ The admission of photographs is within the trial court's discretion and this Court will not disturb that ruling absent an abuse of discretion.[25] The photographs in this case were cumulative to other evidence and other photographs admitted without objection. They depict not the cause of death but the ultimate result of the method of death. They have extremely limited probative value, and their potential for prejudice is overwhelming. They invite an unreasoned response. The prosecutor, evidently aware of this effect, emphasized it by showing these photographs to the jury during closing argument while saying, "That is a human being." We cannot say with any certainty that admission of these photographs did not compel the jury to convict Livingston or to return the maximum sentence available, irrespective of any other evidence. A defendant should be convicted and sentenced by an impartial jury on the strength of the evidence against him and not as a result of an unreasoned feeling provoked by a horrible sight. This abuse of

19. See Tobler v. State, 688 P.2d 350, 355–56 (Okl.Cr.1984) (photographs of corpse in advanced stage of decomposition did not show defendant's handiwork).

20. Revilla v. State, 877 P.2d 1143, 1151 (Okl.Cr. 1994), cert. denied, —— U.S. ——, 115 S.Ct. 764, 130 L.Ed.2d 661 (1995); Trice v. State, 853 P.2d 203, 212 (Okl.Cr.), cert. denied, —— U.S. ——, 114 S.Ct. 638, 126 L.Ed.2d 597 (1993).

21. 12 O.S.1991, § 2403; Mitchell v. State, 884 P.2d 1186, 1196 (Okl.Cr.1994).

22. Neill v. State, 896 P.2d 537, 552 (Okl.Cr. 1994); McCormick v. State, 845 P.2d 896, 898 (Okl.Cr.1993).

23. McCormick, 845 P.2d at 899; Thomas v. State, 811 P.2d 1337, 1345 (Okl.Cr.1991), cert. denied, 502 U.S. 1041, 112 S.Ct. 895, 116 L.Ed.2d 798 (1992).

24. Neill, 896 P.2d at 552; Tobler, 688 P.2d at 356; President v. State, 602 P.2d 222, 226 (Okl. Cr.1979).

25. Mitchell, 884 P.2d at 1196.

discretion constitutes a substantial violation of Livingston's rights.[26]

In conclusion, this Court reverses the case because (1) an actual conflict of interest deprived Livingston of his right to effective assistance of counsel, and (2) improper limitation of bias evidence deprived him of his right to confrontation of witnesses. Furthermore, gruesome and prejudicial pictures were erroneously admitted as evidence against Livingston. For these reasons Livingston's case must be reversed and remanded for a new trial.[27]

JOHNSON, P.J., and LANE and STRUBHAR, JJ., concur.

LUMPKIN, J., concurs in results.

LUMPKIN, Judge, concurring in results.

I concur in the Court's decision to reverse and remand this case for a new trial. However, I disagree with the Court's resolution of Appellant's second proposition of error. Appellant has failed to show the relevance of the nature of S.L.'s prior juvenile offenses and contemporary psychological examinations. I fail to see the nexus between the subject matter of the underlying offenses reflected in S.L.'s prior record, and his mental condition at the time, to the issues of bias in this case. The record shows Appellant's right to confrontation was not abridged by the court's ruling as he was able to conduct a meaningful cross-examination of S.L. Defense counsel asked S.L. if his father supported him when he got into trouble with the law, whether his father's response made him mad, whether it was true S.L. hated his father and whether S.L. found it unbearable to live with his father. Defense counsel exposed the fact that S.L. had made up the fact that his father had told him that the man he hired to kill the victim left town. Based upon this record, neither the nature of S.L.'s prior juvenile record nor *Davis v. Alaska* and *Bowman v. State* cited by Appellant are relevant.

Further, the opinion incorrectly says the State conceded the argument. While the

State may not have specifically rebutted each case argued by Appellant, it certainly did not concede the issue.

---

**26.** 20 O.S.1991, § 3001.1.

**27.** As a result of this ruling Livingston's Motion for New Trial before this Court is moot and therefore dismissed.