1999 OK CR 17

**Robert Wayne LAMBERT, Appellant**

v.

**STATE of Oklahoma, Appellee.**

**No. F–96–1567.**

Court of Criminal Appeals of Oklahoma.

April 14, 1999.

Rehearing Denied May 25, 1999.

Mark Barrett Oklahoma, Indigent Defense System, Norman, Trial Counsel, for Appellant.

Kristi L. Christopher, Oklahoma Indigent Defense System, Capital Direct Appeals Division, Norman, Appellate Counsel for Appellant.

Lantz McClain, District Attorney, Sapulpa, Trial Counsel for Appellee.

W.A. Drew Edmondson, Attorney General of Oklahoma, Robert Whittaker, Assistant Attorney General, Oklahoma City, Appellate Counsel for Appellee.

## OPINION

PER CURIAM.

¶1 Robert Wayne Lambert was tried before a jury in Creek County District Court, Case No. CRF–87–240, and convicted of two counts of First Degree Murder in violation of 21 O.S.1981, § 701.7. In accordance with the jury recommendation,[1] the Honorable Donald

---

1. The jury found the existence of three aggravating circumstances: (1) Lambert created a great risk of death to more than one person, 21 O.S. 1981, § 701.12(2); (2) the murders were especially heinous, atrocious or cruel, 21 O.S.1981, § 701.12(4); and (3) the existence of a probabili-

D. Thompson sentenced Lambert to death on each count. Lambert appeals his Judgment and Sentence.

## Facts

¶ 2 On October 6, 1987, Robert Wayne Lambert and Scott Allen Hain robbed, kidnapped and murdered Laura Lee Sanders and Michael Houghton. At some point, Lambert and Hain locked the victims in the trunk of the car. Lambert cut the gas line and one of the defendants set the car on fire. The victims died of asphyxiation and thermal burns.

¶ 3 Lambert was originally convicted in 1988 of first degree murder of both victims and sentenced to death. He was also convicted of two counts of kidnapping, two counts of larceny of an automobile, two counts of robbery with a firearm, and one count of arson. Lambert appealed his Judgment and Sentence. In 1994, this Court reversed Lambert's murder convictions and death sentences and remanded the case for a new trial.[2] The Court affirmed the remaining convictions and sentences.

¶ 4 Before his re-trial, the State filed an Amended Information charging Lambert with First Degree Malice Murder and, in the alternative, First Degree Felony Murder.[3] In 1996, the second trial was held. The jury again found Lambert guilty of two counts of first degree murder and sentenced him to death on each count.

## Double Jeopardy Claims

¶ 5 In his first proposition of error, Lambert contends that double jeopardy barred his prosecution for felony murder. We disagree.

¶ 6 In 1988, Lambert was convicted of murder, kidnapping, larceny, robbery and arson. He appealed. In 1994, this Court reversed Lambert's murder convictions because the State did not charge Lambert with felony murder in its original Information. The original Information only charged Lambert with malice murder. Relying on that Information, Lambert took the stand at his first trial, admitted the underlying felonies, but denied he intended to kill the victims. Then, over Lambert's objections, the trial court instructed the jury on both malice murder and felony murder. The jury returned a general verdict of first degree murder, which this Court was compelled to treat as a finding of felony murder. The Court then concluded that Lambert was prejudiced and misled by the State's failure to charge felony murder and found the murder convictions had to be reversed.[4] The other convictions were affirmed, including Lambert's conviction for robbery with a dangerous weapon. In affirming the robbery conviction, the Court stated, "We also recognize that should the State re-file the information charging felony murder, in addition to or in place of malice aforethought murder, the trial court can abrogate the conviction for armed robbery in the event Appellant is convicted of felony murder."[5]

¶ 7 Before the second trial, the State corrected its error and filed an Amended Information charging Lambert with two counts of malice murder and, in the alternative, two counts of felony murder. The underlying felony for the felony murder charge was robbery with a dangerous weapon. The jury

---

ty that Lambert would commit criminal acts of violence that would constitute a continuing threat to society, 21 O.S.1981, § 701.12(7).

2. *Lambert v. State*, 1994 OK CR 79, 888 P.2d 494, 505 [hereinafter *Lambert I*].

3. 21 O.S.1981, § 701.7 provides, in pertinent part:
 A person commits murder in the first degree when that person unlawfully and with malice aforethought causes the death of another human being....
 A person also commits the crime of murder in the first degree when he takes the life of a human

being, regardless of malice, in the commission of ... robbery with a dangerous weapon.

4. *Lambert I*, 888 P.2d at 503–05.

5. *Id.* Under Oklahoma law, a defendant cannot be convicted of both felony murder and the underlying felony used to support the felony murder charge. *See Harris v. Oklahoma*, 433 U.S. 682, 97 S.Ct. 2912, 53 L.Ed.2d 1054 (1977) (underlying felony and felony murder merge into one offense for purposes of double jeopardy in Oklahoma).

was instructed on both felony murder and malice murder. Again, the jury returned a general verdict of first degree murder. The trial court did not abrogate the underlying felony conviction that was previously affirmed in *Lambert I*, and it does not appear that either party requested the court to do so.

¶ 8 On appeal, Lambert argues that his 1996 first degree murder convictions are barred by double jeopardy because he has already been convicted of the two underlying felonies—robbery with a dangerous weapon—and these felony convictions are final. Before getting into the merits of this argument, we note that we face the same problem that we faced in *Lambert I* and in *Hain v. State*.[6] The jury, although instructed on malice murder and felony murder, returned a general verdict of first degree murder. This Court has "long held that a conviction for murder may be affirmed where alternative theories are charged when the evidence supports either malice aforethought or felony murder."[7] Here, the evidence supported either theory and the instructions on both theories were proper. However, because the jury returned a general verdict, we do not know under which theory the jury convicted Lambert.[8] This Court has held that where the jury's verdict does not specify either felony murder or malice murder, the verdict must be treated as one of felony murder.[9] Thus, Lambert's conviction must be treated as felony murder. We now turn to the merits of Lambert's double jeopardy claim.

■ ¶ 9 It is well-established that when an appellate court reverses a conviction and remands the case for a new trial, double jeopardy does not bar re-trial. This principle

known as "continuing jeopardy" is implicit in re-trials after a reversal on appeal and " 'has application where criminal proceedings against an accused have not run their full course.' "[10] The Supreme Court has made clear that "[i]nterests supporting the continuing jeopardy principle involve fairness to society, lack of finality, and limited waiver."[11] Since this case concerns a re-trial after a successful appeal, it would appear that double jeopardy does not bar Lambert's felony murder prosecution.

¶ 10 Lambert tries to get around this problem by arguing that jeopardy did not attach to the felony murder charge until 1996. According to Lambert, two separate prosecutions are at issue: the one in 1986, in which he was prosecuted for malice murder and the underlying felonies and at which jeopardy for malice murder and robbery attached; and the one in 1996, in which he was prosecuted for felony murder and malice murder and at which jeopardy for felony murder attached. Lambert argues that since jeopardy did not attach to felony murder until 1996, continuing jeopardy does not apply.

■ ¶ 11 To the contrary, we find jeopardy for the charge of felony murder attached at the first trial. This Court has found that "where an information charges first degree malice aforethought murder, a conviction may be had for felony-murder if supported by the evidence."[12] Thus, if Lambert had not been prejudiced by the felony murder instructions, a conviction on those grounds would have been affirmed. Moreover, the failure to charge Lambert with felony murder was a due process error rath-

---

6. 1993 OK CR 22, 852 P.2d 744, *cert. denied*, 511 U.S. 1020, 114 S.Ct. 1402, 128 L.Ed.2d 75 (1994) [hereinafter *Hain I*]. A related case, *Hain v. State*, 1996 OK CR 26, 919 P.2d 1130, *cert. denied*, 519 U.S. 1031, 117 S.Ct. 588, 136 L.Ed.2d 517 (1996), will be referred to as *Hain II*.

7. *Id.* at 752.

8. This problem could have been avoided had the jury simply been given verdict forms indicating under which theory the jury was convicting Lambert.

9. *Id.; Munson v. State*, 1988 OK CR 124, 758 P.2d 324, 332, *cert. denied*, 488 U.S. 1019, 109 S.Ct. 820, 102 L.Ed.2d 809 (1989).

10. *Justices of Boston Mun. Court v. Lydon*, 466 U.S. 294, 308, 104 S.Ct. 1805, 1813, 80 L.Ed.2d 311 (1984), (quoting *Price v. Georgia*, 398 U.S. 323, 329, 90 S.Ct. 1757, 1761, 26 L.Ed.2d 300 (1970)).

11. *Id.*

12. *Munson*, 758 P.2d at 332.

er than a jurisdictional error. In *Parker v. State*,[13] this Court stated:

> Jurisdiction is conferred on the trial court by the commission of a public offense where venue properly lies in that trial court. 22 O.S.1991, §§ 121–136. Thus, a trial court's jurisdiction is triggered by the filing of an Information alleging the commission of a public offense with appropriate venue. Therefore, this Court concludes that any failure to allege facts constituting the offense raises due process questions but does not affect the trial court's jurisdiction.

Therefore, Lambert's re-trial for felony murder is not a new and separate action.[14]

¶ 12 Lambert tries to persuade the Court that *LaFevers v. State*,[15] controls and bars his prosecution for felony murder. Again, we disagree. In *LaFevers*, the defendant was originally tried and convicted of first degree burglary, first degree robbery, kidnapping, larceny of a motor vehicle, malice murder, third degree arson, first degree rape, and forcible anal sodomy. On appeal, the Court affirmed the burglary, robbery, kidnapping and larceny convictions, and reversed the malice murder, third degree arson, rape and sodomy convictions.[16] LaFevers was re-tried and again convicted of malice murder. On appeal of the re-trial, LaFevers argued error occurred when the State charged him with felony murder in the re-trial since he had previously been convicted of the underlying felony of kidnapping and that conviction was affirmed. The Court agreed but upheld LaFevers' conviction because LaFevers was convicted of malice murder and not felony murder. Lambert's case is distinguishable from *LaFevers*. First, in *LaFevers* felony murder was not charged or at issue in the first trial. Jeopardy for the felony murder charge thus did not attach until LaFevers' second trial. Unlike Lambert's case, the *LaFevers'* Court did not have continuing jurisdiction over the felony-murder charge, as we do here. Second, the Court in *Lambert I* clearly intended re-prosecution on felony-murder.

■ ¶ 13 The real question here is whether affirming the robbery convictions in *Lambert I* somehow precludes prosecuting and punishing Lambert for felony murder. Under Oklahoma law, felony murder and the underlying felony merge into one offense.[17] Traditionally, when this Court reviews convictions for both felony murder and the underlying felony, we sustain the murder conviction and vacate the underlying felony conviction.[18] Lambert argues that the underlying felony convictions are final and the State cannot now exact a punishment for felony murder based on the same underlying felony. Lambert contends that to cure the "double punishment" problem

---

**13.** 1996 OK CR 19, 917 P.2d 980, 985 (footnote omitted), *cert. denied*, 519 U.S. 1096, 117 S.Ct. 777, 136 L.Ed.2d 721 (1997).

**14.** *See Boyd v. Meachum*, 77 F.3d 60 (2d Cir. 1996) (finding double jeopardy did not bar re-trial for felony murder where at first trial, court had power over defendant's person in a basic sense so as to render judgment on felony murder charge). Lambert's reliance on *Todd v. Lansdown*, 1987 OK CR 167, 747 P.2d 312, is misplaced. *Todd* involved two clearly separate prosecutions whereas Lambert's case involves a re-trial after a successful appeal. Lambert also cites *Terry v. Potter*, 111 F.3d 454 (6th Cir.1997). In *Terry*, the defendant was charged with intentional murder and, in the alternative, wanton murder. The jury convicted him of intentional murder but did not explicitly acquit him of the wanton murder. The case was reversed on appeal, and the State again charged him under both murder theories. The Sixth Circuit found that continuing jeopardy did not apply to wanton murder finding that "the verdict on the intentional murder charge can be interpreted as an implied acquittal." *Id.* at 458. We do not interpret the general first degree murder verdict as an acquittal on felony murder, and *Terry* is not applicable. Likewise *Ball v. State*, 57 Md.App. 338, 470 A.2d 361 (1984) and *United States v. Cavanaugh*, 948 F.2d 405 (8th Cir.1991), which are cited by Lambert, involve completely different legal and factual issues that are not applicable here.

**15.** 1995 OK CR 26, 897 P.2d 292, *cert. denied*, 516 U.S. 1095, 116 S.Ct. 820, 133 L.Ed.2d 763 (1996).

**16.** *Id.*

**17.** *Harris v. Oklahoma*, 433 U.S. 682, 97 S.Ct. 2912, 53 L.Ed.2d 1054 (1977).

**18.** *See, e.g., Hain I*, 852 P.2d at 752; *Munson*, 758 P.2d at 332–33.

here we must set aside the felony-murder convictions rather than the underlying felony convictions.

¶ 14 The Court in *Lambert I* specifically retained jurisdiction over the underlying felony stating that "the trial court can abrogate the conviction for armed robbery in the event Appellant is convicted of felony murder." [19] Thus, we have jurisdiction over the underlying felonies as well as the murder convictions, and we can craft the appropriate remedy to cure any multiple punishment problem. The proper resolution of this problem is to vacate the convictions and sentences for the underlying felonies.

¶ 15 To dissuade us from this course of action, Lambert argues that the Court did not retain jurisdiction over the underlying felonies and that the language in *Lambert I* regarding the robbery convictions was merely advisory.[20] *Lambert I* was not an advisory opinion. We clearly had appellate authority over the robbery convictions and clearly expressed that the district court could abrogate those convictions should Lambert be convicted of felony murder.

■ ¶ 16 Lambert also seeks a constricted view of this Court's mandate and scope of relief.[21] In *Greenwood v. State*,[22] the Court stated that when we issue an opinion or order, the trial court is empowered to enforce that opinion or order, but the trial court may not go beyond our mandate. The Court concluded that the trial court had the power to act on authority given to it by this Court in the body of the opinion, including specific, explicit instructions that may be set out in the opinion.[23] Clearly in the body of *Lambert I* we granted the trial court authority to abrogate the underlying felonies. The

trial court's failure to do so was an error. We have authority to cure that error and to abrogate the underlying felonies at this time. By dismissing the underlying felony convictions, we cure the double jeopardy objections.

¶ 17 Moreover, 22 O.S.1991, § 1070 provides, "On a judgment of affirmance against the defendant, the original judgment must be carried into execution, as the appellate court may direct." Here, the Court directed that the robbery convictions were to be affirmed but could be abrogated if Lambert was subsequently convicted of felony murder. Nothing in § 1070 defeats or limits the action taken by this Court in *Lambert I*. Likewise, 22 O.S.1991, § 1066 empowers this Court to do exactly what we did in *Lambert I*, and the underlying felony may be vacated.

¶ 18 The Court expressed and exercised its continuing jurisdiction over Lambert's robbery convictions in its express language and instructions set out in *Lambert I*. The Court retains its continuing jurisdiction over the felony murder convictions. We now affirm the felony murder convictions and reverse with instructions to dismiss the underlying felonies of robbery with a dangerous weapon.

■ ¶ 19 Lambert raises a second double jeopardy issue in his third proposition of error. Lambert contends that 21 O.S.1991, § 11 bars his prosecution for malice murder. As discussed above, the jury returned a general verdict of first degree murder, even though it was instructed on both malice murder and felony murder. In such cases, this Court treats the general verdict as felony murder. Since we must treat the verdict as one of felony murder, the question of wheth-

19. 888 P.2d at 505.

20. *Matter of L.N.*, 1980 OK CR 72, 617 P.2d 239.

21. *See Bonner v. Brock*, 1980 OK CR 27, 610 P.2d 265; *Greenwood v. State*, 1963 OK CR 46, 381 P.2d 895; *Ex parte Peck*, 96 Okl.Cr. 71, 248 P.2d 655 (1952); *Reed v. State*, 10 Okl.Cr. 444, 137 P. 369 (1914).

22. 1963 OK CR 46, 381 P.2d 895.

23. *Id.* at 898. Lambert's reliance on *Chaney v. Brown*, 1985 OK CR 47, 699 P.2d 159, is misplaced because *Chaney* concerned the scope of

re-sentencing under 21 O.S.1981 § 701.13, which is not at issue here. Likewise, *Johnson v. State*, 97 Okl. Cr. 255, 261 P.2d 905 (1953), is inapplicable because it concerned this Court's authority where the defendant fails to file a motion for a new trial, which plainly is not at issue here. *Carder v. Court of Criminal Appeals*, 1978 OK 130, 595 P.2d 416, 419, is inapplicable because it concerned the Court's authority over juvenile cases, and *Wallace v. State*, 1996 OK CR 8, 910 P.2d 1084, which concerns jurisdiction in capital post-conviction proceedings, is also inapplicable.

er double jeopardy bars prosecution for first degree malice murder is moot.

## Competency Issues

¶ 20 Prior to Lambert's re-trial, the trial court conducted a post-examination competency hearing and found Lambert competent to stand trial. On appeal, Lambert raises several issues concerning his competency to stand trial.

¶ 21 In his fifth and thirteenth propositions of error, Lambert raises concerns regarding the admission of his confession at his competency hearing. In Proposition V, Lambert contends that admission of his confession at his competency trial was error because the State failed to show that he knowingly and intelligently waived his rights before speaking with the police.

¶ 22 The post-examination competency hearing at issue here is the second time a jury has determined Lambert's competency to stand trial. During Lambert's initial appeal, this Court remanded the case for a retrospective competency proceeding.[24] At the retrospective competency hearing, the State sought to introduce Lambert's video-taped confession. The trial court held a *Jackson v. Denno*[25] hearing and found that Lambert knowingly and voluntarily waived his rights. The trial court allowed the video tape to be shown to the jury. In *Lambert I*, we found that the trial court properly allowed this evidence at Lambert's retrospective competency hearing.[26]

¶ 23 At the competency hearing before Lambert's re-trial, the State again sought to have Lambert's confession played to the jury. Both parties agreed to forego a *Jackson v. Denno* hearing and rely on the transcripts from the previous proceedings. Relying on those transcripts and this Court's holding in *Lambert I*, the trial court allowed the confession to be played to the jury.

¶ 24 This Court decided this issue in *Lambert I*. In the current appeal, Lambert waived holding a new hearing and relied solely on the previous *Jackson v. Denno* hearing transcripts. As the Court found in *Lambert I* there is sufficient evidence to support the finding that Lambert waived his rights.[27] We concur with our earlier opinion and find the trial court did not err in allowing this evidence at the competency hearing.

¶ 25 In his thirteenth proposition, Lambert argues that his competency hearing was unfair because the prejudicial impact of his confession outweighed its probative effect. As discussed above, the trial court did not abuse its discretion in allowing the confession to be heard. Lambert argues that playing the confession at the competency hearing was of little probative value. To the contrary, it gave the jury an example of Lambert's ability to communicate, which was relevant to the issues before the jury. Moreover, this Court found this evidence relevant in Lambert's 1991 retrospective competency hearing.[28] The trial court did not abuse its discretion in allowing the video to be played for the jury.[29] This proposition is denied.

¶ 26 In his eleventh proposition of error, Lambert contends the evidence is insufficient to sustain the jury's finding that he was competent to stand trial. A defendant is deemed competent to stand trial unless he proves by a preponderance of the evidence that he is incompetent.[30] Lambert contends that the jury's finding that he was competent cannot be sustained under this

**24.** *Lambert v. State*, 1991 OK CR 22, 808 P.2d 72.

**25.** 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964).

**26.** *Lambert I*, 888 P.2d at 499.

**27.** *Id. See Colorado v. Connelly*, 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). Lambert's mental retardation is a factor to be considered in determining voluntariness, but mental retardation is not a per se bar to admissibility of a confession based on voluntary waiver of rights. *Lee v. State*, 1985 OK CR 62, 700 P.2d 1017, 1020.

**28.** *Lambert I*, 888 P.2d at 499.

**29.** 12 O.S.1991, § 2401 et seq.

**30.** *Cooper v. Oklahoma*, 517 U.S. 348, 116 S.Ct. 1373, 134 L.Ed.2d 498 (1996); *Bryan v. State*, 1997 OK CR 15, 935 P.2d 338, 348, *cert. denied*, —— U.S. ——, 118 S.Ct. 383, 139 L.Ed.2d 299 (1997).

burden of proof. We disagree. The record amply supports a finding that Lambert was competent to stand trial under the preponderance of the evidence standard. This proposition is denied.

¶ 27 Lambert argues in Proposition XII that he was prejudiced in his competency trial by the introduction of other crimes evidence. Lambert failed to object to this evidence at trial and has waived review for all but plain error. The evidence elicited was relevant and probative to the issue of Lambert's competence to stand trial. It related directly to Dr. Goodman's evaluation of Lambert's mental state. Admission of evidence of other crimes was not plain error and we decline to grant relief on this basis.

¶ 28 In Proposition XIV, Lambert contends it was error for four State witnesses to testify about Lambert's competence. These four witnesses worked for the Department of Corrections and had regular contact with Lambert. The witnesses stated they found Lambert to be competent. They did not specifically state that he was competent to stand trial. Because these four witnesses were not experts, Lambert states that it was error to allow them to testify about Lambert's competence.

¶ 29 Title 12 O.S.1991, § 2701 governs the admissibility of lay opinion testimony. Section 2701 provides:

If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are:

1. Rationally based on the perception of the witness; and

2. Helpful to a clear understanding of his testimony or the determination of a fact in issue.

In *McGregor v. State*,[31] the Court stated, "Lay witnesses can testify about their observations of defendants if those observations are reasonably proximate in time to the proceedings."[32] Here, the State's witnesses' testimony was rationally based on their perceptions and aided the trier of fact. Under § 2701 and our case law, the trial court did not err in allowing this testimony.[33]

¶ 30 Lambert complains in his fifteenth proposition of error that the standard used to find him competent to stand trial is constitutionally infirm. As stated earlier, the court used the preponderance of the evidence standard as its burden of proof in this trial.[34] Lambert asserts that error occurred because the trial court did not require the jurors to find that Lambert had a rational as well as factual understanding of the proceedings.

¶ 31 The trial court's instructions comported with the Oklahoma Uniform Jury Instructions and 22 O.S.1991, § 1175.3. Lambert criticizes the Oklahoma competency definition and contends it runs afoul of *Dusky v. United States*.[35] In *Dusky*, the Supreme Court stated that the standard for determining competency to stand trial is "whether [the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him."[36] This Court has considered Oklahoma's standard for determining competency and found it consistent with the *Dusky* standard.[37] We again find our competency standard is constitutional and comports with *Dusky*.

¶ 32 After reviewing all of Lambert's alleged errors and defects in the competency proceeding, we find that the proceeding was

31. 1994 OK CR 71, 885 P.2d 1366, *cert. denied*, 516 U.S. 827, 116 S.Ct. 95, 133 L.Ed.2d 50 (1995).

32. *Id.* at 1374.

33. Lambert relies on *McCarty v. State*, 1988 OK CR 271, 765 P.2d 1215, and *Gabus v. Harvey*, 1984 OK 4, 678 P.2d 253. Neither of these cases forbid the lay witness opinion testimony that occurred in this case.

34. *Cooper v. Oklahoma, supra.*

35. 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960).

36. *Id.* at 402, 80 S.Ct. at 789. *See Godinez v. Moran*, 509 U.S. 389, 396, 113 S.Ct. 2680, 2685, 125 L.Ed.2d 321 (1993).

37. *Tate v. State*, 1995 OK CR 24, 896 P.2d 1182, 1188; *Lambert I*, 888 P.2d at 497–98.

proper and comported with due process. We decline to grant any relief based on these claims of error.

### Jury Selection Issues

¶ 33 In Proposition X, Lambert contends the trial court abused its discretion in refusing to allow individual voir dire. This Court has repeatedly stated individual voir dire is not required and the decision to allow individual voir dire is left to the sound discretion of the trial court.[38] Lambert argues that in his case the trial court abused its discretion because of all the pretrial publicity in his case. Lambert overstates the pretrial publicity. Many of the jurors had not heard of the case and those who had heard of the case affirmed that they could put aside any preconceived notions they might have. Lambert has not shown that any jurors were not impartial, or that the trial court abused its discretion in denying him individual voir dire. We decline to grant relief on this basis.

### Ineffective Assistance of Counsel

¶ 34 Lambert argues in his seventh proposition of error that trial counsel was ineffective for (1) failing to move for a change of venue, and (2) failing to listen to a taped confession in second stage. The standard for reviewing claims of ineffective assistance of counsel is well-established and was set out by the Supreme Court in *Strickland v. Washington*.[39] In *Strickland*, the Court set out a two-part test for reviewing claims of ineffective assistance of counsel:

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This

requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.[40]

Lambert's counsel was not ineffective in failing to move for a change of venue. This issue had been raised and rejected in *Lambert I* and in *Hain II*.[41] The decision to not seek a change of venue under these circumstances was a reasonable, strategic decision and it is likely that had the issue been raised, Lambert would have lost on the merits at both the trial and appellate levels. Moreover, many of the potential jurors had not heard of Lambert's case. Those jurors who had heard of the case affirmed that they could put aside that information and fairly and objectively sit in judgment. Lambert has failed to show that counsel was ineffective in this regard.

¶ 35 Lambert argues trial counsel was ineffective because he failed to listen to a tape recording of Lambert's statements to the police regarding other crimes prior to the admission of that tape during second stage. Trial counsel was very well-prepared, submitted many motions, and was a zealous advocate for his client. The information on the tape was not a surprise to counsel and was consistent with the evidence presented at trial. Indeed, trial counsel called Lambert to testify during second stage and Lambert's testimony was consistent with the tape. Even if it may have been prudent for counsel to have listened to the tape, the tape was cumulative, not a surprise and consistent with Lambert's second stage testimony. There was no prejudice and trial counsel was not ineffective.[42]

---

38. *Malone v. State*, 1994 OK CR 43, 876 P.2d 707, 711 ("decision to allow individual voir dire of potential jurors is also committed to the sound discretion of the trial court and is not a right guaranteed a defendant").

39. 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

40. *Id.* at 687, 104 S.Ct. at 2064.

41. 1996 OK CR 26, 919 P.2d 1130.

42. Lambert also filed an application for an evidentiary hearing to explore issues concerning the effectiveness of trial counsel. Under Rule 3.11, *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch.18, App. (1998), an evidentiary hearing is warranted only if the defendant shows by clear and convincing evidence that trial counsel was ineffective. *Darks v. State*, 1998 OK CR

### First Stage Issues

¶ 36 In his second proposition of error, Lambert argues the evidence is insufficient to support his felony-murder convictions. Under 21 O.S.1981, § 701.7(B), "[a] person ... commits the crime of murder in the first degree when he takes the life of a human being, regardless of malice, in the commission of ... robbery with a dangerous weapon." Lambert claims that his use of an unloaded BB gun to rob Sanders and Houghton did not constitute robbery with a dangerous weapon, as that offense is understood under 21 O.S.1981, § 701.7. We reject this claim.

¶ 37 For the purposes of 21 O.S. 1981, § 701.7, the underlying felony of robbery with a dangerous weapon is defined in 21 O.S.1981, § 801.[43] Section 801 provides:

Any person or persons who, with the use of any firearms or any other dangerous weapons, whether the firearm is loaded or not, or who uses a blank or imitation firearm capable of raising in the mind of the one threatened with such device a fear that it is a real firearm, attempts to rob or robs any person or persons, or who robs or attempts to rob any place of business, residence or banking institution or any other place inhabited or attended by any person or persons at any time, either day or night, shall be guilty of a felony, upon conviction therefor.

Under 21 O.S.1981, § 801, the crime of robbery with a dangerous weapon can be accomplished by means of an imitation weapon, which would include a BB gun. In *McArthur v. State*,[44] this Court stated:

¶ 38 Significantly, section 801 allows for the consideration of a victim's subjective belief when the weapon used is a firearm.

The statute can be violated "whether the firearm is loaded or not" and forbids the use of "a blank or imitation firearm capable of raising in the mind of the one threatened with such a device a fear that it is a real firearm." [45]

*McArthur* thus makes clear that § 801 can be violated when a defendant uses an imitation firearm—like a BB gun—to raise in the minds of the victims that the weapon is a real firearm. Lambert concedes that his use of a BB gun to rob Sanders and Houghton would violate § 801. He claims, however, that robbery with a dangerous weapon for the purposes of felony murder under 21 O.S.1981, § 701.7 is more narrowly drafted and that only actual use of a dangerous weapon triggers a first degree felony murder conviction.

¶ 39 In support of this argument, Lambert argues that § 801 is written in the disjunctive and that the use of the term "or" indicates that robbery using an imitation firearm is a separate and different offense from robbery using a dangerous weapon. He indicates that if the legislature had intended to include use of an imitation firearm under the umbrella of robbery with a dangerous weapon in § 701.7 they would have specifically done so.

¶ 40 Lambert analogizes to other cases involving limitations on the scope of felony murder. He first cites *Richie v. State*,[46] in which this Court found that kidnapping by extortion was not an enumerated felony under § 701.7. However, in contrast to Lambert's case, kidnapping by extortion is defined in 21 O.S.1991, § 745(A), whereas kidnapping is defined in 21 O.S.1991, § 741. Thus, *Richie* concerns two separate and distinct statutes; Lambert's case concerns only § 801. Lambert also cites *Boutwell v.*

---

15, 954 P.2d 152, 168. Lambert's application does not meet this high burden. The newspaper articles and other evidence showing the pre-trial publicity in this case do not adequately show that trial counsel was ineffective. Given the lack of juror bias and this Court's previous decisions in *Lambert I* and *Hain II*, the additional evidence presented in this application fails to show by clear and convincing evidence that trial counsel was ineffective in his handling of this issue. Accordingly, we find an evidentiary hearing to be unnecessary and deny Lambert's application.

**43.** *Powell v. State*, 1995 OK CR 37, 906 P.2d 765, 774 n. 8, *cert. denied*, 517 U.S. 1144, 116 S.Ct. 1438, 134 L.Ed.2d 560 (1996).

**44.** 1993 OK CR 48, 862 P.2d 482.

**45.** *Id.* at 484.

**46.** 1995 OK CR 67, 908 P.2d 268, *cert. denied*, 519 U.S. 837, 117 S.Ct. 111, 136 L.Ed.2d 64 (1996).

*State.*[47] However, *Boutwell* concerns the construction of the murder for remuneration aggravating circumstance under 21 O.S.1991, § 701.12(3) and is not applicable to the facts presented in this case. These cases are not controlling and do not force the conclusion that Lambert would like.

¶ 41 Indeed, Lambert's suggested narrowing of robbery with a dangerous weapon that is enumerated in § 701.7 is inconsistent with this Court's case law. In *James v. State*,[48] the Court considered the scope of the underlying felony of robbery with a dangerous weapon under § 701.7. In *James*, the defendant had attempted to rob the victim, but was unsuccessful. During the course of the attempted robbery, the victim was shot and killed. The defendant argued that an attempted armed robbery was not among the enumerated felonies under § 701.7. The Court disagreed and "concluded that the Legislature intended to include attempted armed robbery in the felony murder statute, just as they intended to include attempted armed robbery in the statute defining armed robbery."[49] Likewise, the Legislature intended to include robbery with an imitation weapon in the felony murder statute, just as they intended to include robbery with an imitation weapon in the robbery with a dangerous weapon statute.[50]

¶ 42 Moreover, in footnote 8 of *Powell v. State*,[51] this Court set out the elements of first degree felony murder where the underlying felony is robbery with a dangerous weapon. The Court wrote:

The elements of First Degree Felony Murder with the underlying felony of Robbery with a Dangerous Weapon are: First, the death of a human; Second, the death occurred as a result of an act or event which

happened in the commission of robbery with a dangerous weapon; Third, caused by the defendant(s) while in the commission of robbery with a dangerous weapon; Fourth, wrongful; Fifth, taking; Sixth, carrying away; Seventh, personal property; Eighth, of another; Ninth, from the person or immediate presence of another; Tenth, by force or fear; Eleventh, by use of a loaded/unloaded/*imitation firearm,* or other dangerous weapon.[52]

*Powell* demonstrates this Court's understanding that robbery with a dangerous weapon under § 701.7 includes robbery with an imitation firearm.

¶ 43 Finally, Lambert objects to the trial court's instructions on felony murder.[53] The trial court instructed the jury as follows:

No person may be convicted of murder in the first degree unless the State has proved beyond a reasonable doubt each element of the crime. These elements are:

*First,* the death of a human;

*Second,* the death occurred as a result of an act or event which happened in the commission of a robbery with a dangerous weapon;

*Third,* caused by the defendant or any person engaged with he defendant while in the commission of a robbery with a dangerous weapon;

*Fourth,* the elements of the robbery with a dangerous weapon the defendant is alleged to have been in the commission of are as follows:

 *First,* wrongful;

 *Second,* taking;

 *Third,* carrying away;

---

47. 1983 OK CR 17, 659 P.2d 322.

48. 1981 OK CR 145, 637 P.2d 862.

49. *Id.* at 865.

50. Lambert tries to distinguish *James* by arguing that a BB gun is not likely to cause death and the defendant's conduct in *James* could have resulted in death. However, § 801 specifically provides, and *McArthur* specifically recognizes, that an imitation firearm, like the BB gun at issue here, does qualify as a dangerous weapon sufficient to

satisfy the requirements of the statute. Lambert's reliance on *State v. Wilson,* 282 Mont. 134, 936 P.2d 316 (1997), is also misplaced. The Montana statute is quite different from 21 O.S. 1981, § 801, and Montana case law provides no guidance in the interpretation of Oklahoma law.

51. 906 P.2d at 774 n. 8.

52. *Id.* (emphasis added).

53. Inexplicably, the State fails to address this issue in its brief.

*Fourth*, personal property;

*Fifth*, of another;

*Sixth*, from the person or the immediate presence of another;

*Seventh*, by force or fear;

*Eighth*, through use of a loaded or unloaded firearm or a blank or imitation firearm capable of raising in the mind of the person threatened with such device a fear that it is a real firearm or a dangerous weapon.[54]

Lambert objects particularly to the language in the eighth element in the robbery definition, as set out above. However, the language in the eighth element is identical to OUJI–CR 489 and OUJI–CR 2d ed. 4–144. The language is also consistent with, although not identical to, footnote 8 of *Powell v. State*, discussed above. The trial court's instructions were proper.

¶ 44 Lambert insists that the trial court should have included an instruction defining firearms. The inclusion of the instruction was unnecessary under the facts of this case. We find the evidence sufficient to support Lambert's conviction and find the trial court's instructions were proper. This proposition is denied.

¶ 45 In his fifth proposition,[55] Lambert contends that admission of his confession during the first phase of trial was error. During the first stage of trial, the State sought to admit the confession. The parties waived holding a new *Jackson v. Denno* hearing and asked simply that the court review the transcripts of the earlier proceedings. Relying on those transcripts and this Court's decision in *Lambert I*, the trial court allowed the confession to be played to the jury. As discussed earlier in this opinion, in *Lambert I* the Court found sufficient evidence to support the finding that Lambert waived his rights.[56] We concur with our earlier opinion and find the trial court did not err in allowing this evidence. Relief is denied based on this proposition of error.

¶ 46 In Proposition VI, Lambert complains that reversible error occurred in the guilt phase of trial when the State's rebuttal witness, Dr. Thomas Goodman, improperly referred to other crimes evidence and violated the prohibition against evidentiary harpoons. It is well-established that "when one is put on trial, one is to be convicted if at all by evidence which shows one guilty of the offense charged; and proof that one is guilty of other offenses not connected with that for which one is on trial must be excluded." [57] Other crimes evidence, however, is admissible if it "tends to establish motive, intent, absence of mistake or accident, identity or a common scheme or plan which embraces the commission of two or more crimes so related to each other that proof of one tends to establish the other." [58]

¶ 47 In addition, the Court forbids witnesses from making "evidentiary harpoons" that unfairly skewer the defendant. The Court has described evidentiary harpoons as voluntary statements generally made by experienced police officers or by lay witnesses [59] that "are willfully jabbed rather than inadvertent" to inject other crimes evidence calculated to prejudice the defendant and which do in fact prejudice the defendant.[60]

¶ 48 Lambert argues that Goodman's references to Lambert's stealing, Lambert's arson while in jail and an attempted sexual assault Lambert committed when he was a young adolescent constituted imper-

---

54. O.R. Vol. XIV at 2544.

55. See earlier discussion of fifth proposition of error at it relates to the post-examination competency hearing.

56. *Id. See Colorado v. Connelly*, 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). Lambert's mental retardation is a factor to be considered in determining voluntariness, but mental retardation is not a per se bar to admissibility of a confession based on voluntary waiver of rights. *Lee*, 700 P.2d at 1020.

57. *Burks v. State*, 1979 OK CR 10, 594 P.2d 771, 772, *overruled on other grounds by Jones v. State*, 1989 OK CR 7, 772 P.2d 922.

58. *Id.*

59. *Womble v. State*, 1983 OK CR 64, 663 P.2d 747, 749.

60. *Bruner v. State*, 1980 OK CR 52, 612 P.2d 1375, 1378.

missible evidence of other crimes or bad acts [61] or alternatively was an evidentiary harpoon. The trial court had limited Dr. Goodman's testimony regarding other crimes, and it is evident that Dr. Goodman referred to other crimes or bad acts in contravention to the court's instructions. However, these references were brief and relatively innocuous. Under the circumstances, the error is harmless.[62]

¶ 49 Lambert also complains that the prosecutor improperly elicited from Thomas White that the BB gun used by Lambert in this case was stolen from White's grandmother. At trial, Lambert objected to the evidence and the objection was overruled.[63] This evidence was irrelevant other crimes evidence, and it should not have been elicited. However, again we must find that in light of the overwhelming evidence of guilt, the error was harmless.

¶ 50 In Proposition VIII, Lambert objects to: (1) photographs of the victims; (2) the State's witnesses' description of the victims' bodies and the crime scene; and (3) Sanders' mother's testimony identifying the sleeping bag found under Sanders' burnt car. He argues the prejudicial effect of this evidence warrants reversal of his convictions. We disagree.

¶ 51 Without a doubt, the murders and the method of death in this case were horrible and of necessity the descriptions and photographs of this crime capture some of this horror. It is well established that "[t]he test for admissibility of a photograph is not whether it is gruesome or inflammatory, but whether its probative value is substantially outweighed by the danger of unfair prejudice."[64] Moreover, "[t]he probative value of photographs of murder victims can be manifested in numerous ways, including showing the nature, extent and location of wounds, establishing the corpus delicti, depicting the crime scene, and corroborating the medical examiner's testimony."[65]

¶ 52 At issue here are Exhibits G1 and G2, which were black and white photographs of the victims as they were found in the trunk of the car. Lambert cites *Livingston v. State*,[66] in which the Court held that photographs of the charred remains of the victim laid out on the morgue table were prejudicial, although two small photographs of the victim at the crime scene and a photograph of the burned house were admissible. The photographs here are not as horrific as those discussed in *Livingston* and the photographs, as well as the witnesses' testimony, were relevant in depicting the crime scene and corroborating the medical examiner.[67] Lambert also objects to Exhibits J, R and S, none of which depicted the victims. The trial court did not abuse its discretion in admitting these photographs. Similarly, allowing the jurors to view the medical examiner's report, which was relevant to the cause of death, was not an abuse of discretion. Finally, although several witnesses related what they found at the crime scene, the testimony was not unduly prejudicial, repetitive or un-

---

61. *Freeman v. State*, 1988 OK CR 192, 767 P.2d 1354, 1356–57 (prohibition against other crimes evidence includes bad acts which may be non-criminal).

62. Since Dr. Goodman was a rebuttal witness, the failure to file a *Burks* notice was not error. *Freeman v. State*, 1984 OK CR 60, 681 P.2d 84, 85.

63. Again, the State inexplicably fails to address an issue raised by Lambert.

64. *Hooks v. State*, 1993 OK CR 41, 862 P.2d 1273, 1280, *cert. denied*, 511 U.S. 1100, 114 S.Ct. 1870, 128 L.Ed.2d 490 (1994).

65. *Trice v. State*, 1993 OK CR 19, 853 P.2d 203, 212–13, *cert. denied*, 510 U.S. 1025, 114 S.Ct. 638, 126 L.Ed.2d 597 (1993).

66. 1995 OK CR 68, 907 P.2d 1088, 1094.

67. *Sattayarak v. State*, 1994 OK CR 64, 887 P.2d 1326, 1330, is distinguishable because post-autopsy photographs are not at issue here. Likewise the photographs at issue in Lambert's case are distinguishable from the photographs at issue in *Spunaugle v. State*, 1997 OK CR 47, 946 P.2d 246, 253, and *Tobler v. State*, 1984 OK CR 90, 688 P.2d 350, 355–56, as the photographs here did not include photographs of a decomposing or maggot-infested body. Finally, the photographs here were black and white, non-close-up photographs of the interior of the trunk. These photographs are distinguishable from the color, close-up photographs that this Court found needlessly gruesome in *Jones v. State*, 1987 OK CR 103, 738 P.2d 525, 528.

justified. The prosecutor's comments on this admissible evidence was not error. Relief is not warranted.[68]

¶ 53 Lambert also complains about the State's calling Laura Sanders' mother to testify during first stage. Mrs. Sanders identified the sleeping bag that was found under Sanders' burned car. Lambert objected to this evidence at trial and offered to stipulate that the sleeping bag belonged to Sanders' brother.

 ¶ 54 In *Hain I*,[69] during the first stage of trial, the State also called Mrs. Sanders to identify her daughter and some belongings. It is unclear from the *Hain I* opinion how extensive or emotional Mrs. Sanders' testimony was. The Court concluded "the testimony of the relatives as to the identification of the victims and their belongings may have been unnecessary in light of other testimony to the same facts, at most it was merely cumulative. We do not find that fundamental error has occurred."[70] Here, Mrs. Sanders' testimony was relatively straightforward and unemotional. She did not testify in an improper or inappropriate manner. Moreover, the State was not obligated to accept Lambert's offer to stipulate to the ownership of the sleeping bag.[71] The evidence was relevant and no error occurred in allowing her to testify on this limited issue.

¶ 55 Lambert argues in his ninth proposition of error that the trial court should have given a second degree felony murder instruction. The trial court did instruct the jury on second degree depraved mind murder, but Lambert did not request, and the trial court did not give, a second degree felony murder instruction. The State argues the issue is waived. However, this Court has stated "the trial court should give such instructions whether requested or not if they are warranted by the evidence."[72] We review for plain error.

 "Lesser included offenses should be given to the jury, but only when warranted by the evidence."[73] In *Foster v. State*,[74] the Court stated that a second degree felony murder instruction should be given where there is evidence that the robbery was not accomplished through the use of a dangerous weapon.[75] In *Foster*, however, the Court found the evidence did not warrant a second degree felony murder instruction where the defendant used a bat and a knife to beat and stab the victim. Under those facts, a lesser instruction on robbery by force or fear was not warranted.

¶ 56 Here, Lambert used a BB gun. The BB gun looked like a real weapon and was designed to place the victims in fear. Hain used a knife, which is clearly a dangerous weapon. Both the BB gun, as used here,[76] and the knife, fall under 21 O.S.1981, § 801. Lambert's actions fit squarely under § 801. A finding that the robbery was not accomplished by force or fear was not warranted by the evidence. The trial court did not err in failing to sua sponte give a second degree felony murder instruction.

 ¶ 57 Finally, Lambert argues that the failure to give the lesser instruction deprived the jury of its full sentencing options as required in *Beck v. Alabama*.[77] *Beck* is

---

68. Similar evidence was submitted in Hain's resentencing trial and this Court found the admission was relevant to prove the aggravating circumstance and not unduly prejudicial. *Hain II*, 919 P.2d at 1142–43.

69. 852 P.2d at 752.

70. *Id.*

71. *Guy v. State*, 1989 OK CR 35, 778 P.2d 470, 473.

72. *Pickens v. State*, 1994 OK CR 74, 885 P.2d 678, 682–83, *overruled on other grounds, Parker v. State*, 1996 OK CR 94, 917 P.2d 980.

73. *Foster v. State*, 1986 OK CR 19, 714 P.2d 1031, 1039.

74. *Id.* at 1037.

75. *See Swain v. State*, 1977 OK CR 295, 569 P.2d 1009, 1013–14 (finding trial court should have given second degree felony murder instruction where belt used by defendant was not dangerous weapon under § 801).

76. *McArthur, supra.*

77. 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980).

not applicable here because the jury was fully instructed on all its sentencing options, which included life imprisonment, life imprisonment without the possibility of parole and death.[78]

¶ 58 In conclusion, we find that none of the issues raised concerning the first stage of Lambert's trial· are meritorious. We affirm Lambert's murder convictions and vacate his robbery convictions.

## Second Stage Issues

■ ¶ 59 In Proposition IV, Lambert asks this Court to find the execution of the mentally retarded violates the state and federal constitutions. In light of *Penry v. Lynaugh*,[79] we decline to grant relief.

■ ¶ 60 In Proposition XVI, Lambert argues that during the second stage of trial the trial court should have held a *Jackson v. Denno* hearing regarding the admissibility of Lambert's audio-tape confession of certain crimes committed in Kansas. This tape was introduced to prove the continuing threat aggravating circumstance. Lambert did not object to the admission of the tape and he did not request a *Jackson v. Denno* hearing. The trial court asked Lambert about making a record and Lambert stated he had no objection to the introduction of the tape.[80] A *Jackson v. Denno* hearing is not required in the absence of an objection to the evidence.[81] Because Lambert did not object to the admission of the tape and did not request a *Jackson v. Denno* hearing, this issue is waived. The proposition is denied.

¶ 61 In Proposition XVII, Lambert challenges the constitutionality of the following aggravating circumstances: (1) continuing threat, (2) risk of death to more than one person, and (3) heinous, atrocious or cruel. He also contends the aggravating circumstances were not adequately defined. We disagree for the reasons set forth below.

¶ 62 This Court has repeatedly rejected attacks on the constitutionality of the continuing threat aggravating circumstance.[82] Our case law compels us to deny this argument. Lambert also objects to OUJI–CR 2d 4–74, which defines the continuing threat aggravating circumstance.[83] The instruction is consistent with our statutory and case law, and the trial court did not err in giving this instruction. This claim is denied.

■ ¶ 63 Lambert argues that the risk of death to more than one person aggravating circumstance is overbroad. Under our case law, the killing of more than one person under the circumstances of this case satisfies this aggravating circumstance.[84] This definition narrows the class of persons who may be executed and is not unconstitutional. This claim is rejected.

■ ¶ 64 Lambert claims that the heinous, atrocious or cruel aggravating circumstance is also unconstitutionally broad. This Court has narrowed this aggravating circumstance by requiring a finding that death was preceded by "serious physical abuse."[85] However, Lambert contends the trial court did not adequately instruct the jury on this

---

78. *Cheney v. State*, 1995 OK CR 72, 909 P.2d 74, 92 n. 73. *See Hopkins v. Reeves*, 524 U.S. 88, 118 S.Ct. 1895, 141 L.Ed.2d 76 (1998).

79. 492 U.S. 302, 109 S.Ct. 2934, 2954, 106 L.Ed.2d 256 (1989) (plurality opinion).

80. Vol. IV Tr. at 383.

81. *Wainwright·v. Sykes*, 433 U.S. 72, 86, 97 S.Ct. 2497, 2506, 53 L.Ed.2d 594 (1977). Lambert cited several cases in which the trial court erred in not holding a hearing after counsel requested the hearing. These cases are distinguishable because Lambert did not request such a hearing.

82. *Hamilton v. State*, 1997 OK CR 14, 937 P.2d 1001, 1012 (and cases cited therein).

83. OUJI–CR 2d 4–74 provides:

The State has alleged that there exists a probability that the defendant will commit future acts of violence that constitute a continuing threat to society. This aggravating circumstance is not established unless the State proved beyond a reasonable doubt:
*First*, that the defendant's behavior has demonstrated a threat to society; and
*Second*, a probability that this threat will continue to exist in the future.

84. *Hooker v. State*, 1994 OK CR 75, 887 P.2d 1351, 1364, *cert. denied*, 516 U.S. 858, 116 S.Ct. 164, 133 L.Ed.2d 106 (1995).

85. *Stouffer v. State*, 1987 OK CR 166, 742 P.2d · 562, 563–64.

narrowing construction of the aggravating circumstance. The trial court instructed the jury that:

> As used in these instructions, the term "heinous" means extremely wicked or shockingly evil; "atrocious" means outrageously wicked and vile; "cruel" means pitiless, or designed to inflict a high degree of pain, utter indifference to, or enjoyment of, the sufferings of others.
>
> The phrase "especially heinous, atrocious or cruel" is directed to those crimes where the death of the victim was preceded by torture of the victim or *serious abuse*.[86]

In contrast, OUJI–CR 2d 4–73 provides:

> As used in these instructions, the term "heinous" means extremely wicked or shockingly evil; "atrocious" means outrageously wicked and vile; "cruel" means pitiless, or designed to inflict a high degree of pain, utter indifference to, or enjoyment of, the sufferings of others.
>
> The phrase "especially heinous, atrocious, or cruel" is directed to those crimes where the death of the victim was preceded by torture of the victim or *serious physical abuse*. (emphasis added)

Plainly absent from Lambert's instruction is the word "physical" in the last phrase of the instructions. This error has occurred in other cases. In *Mollett v. State*,[87] the Court found the omission of "physical" was not grounds for relief where there was evidence showing conscious mental suffering and physical abuse. In *Johnson v. State*,[88] the Court found the absence of the word "physical" was error, but concluded the error was harmless and declined to grant relief. In *Richie v. State*,[89] the Court concluded that since there was evidence of physical abuse, failing to include the word "physical" in the instructions was harmless error.

¶ 66 Here, there was evidence of physical abuse prior to death. Houghton was stabbed in the back, and both victims had been kidnapped, restrained and forced into the trunk of the car. The mental anguish in this case was great as the victims were locked in the trunk of a car that was set on fire. Any error in failing to include the word "physical" was harmless.

■ ¶ 67 In Proposition XVIII, Lambert contends that his Eighth and Fourteenth Amendment rights were violated by the introduction of unadjudicated offenses in second stage. This Court allows the use of unadjudicated offenses to prove continuing threat.[90] Accordingly, this proposition should be denied.

¶ 68 In his nineteenth proposition of error, Lambert complains that the trial court erred in refusing to give the jury an instruction on the meaning of life without the possibility of parole. This Court has held that it is not error for the trial court to fail to further define the sentence of life without the possibility of parole.[91] Under our case law the trial court did not err in refusing to give Lambert's requested instruction on life without the possibility of parole.[92]

■ ¶ 69 Lastly, Lambert argues in Proposition XX that cumulative error warrants relief. We disagree and decline to grant relief on this basis.

## MANDATORY SENTENCE REVIEW

■ ¶ 70. In accordance with 21 O.S.1991, § 701.13(C), we must determine (1) whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor, and (2) whether the evidence supports the jury's finding of aggravating circumstances. The jury found the existence of three aggravating circumstances: (1) risk of death to more than one person; (2) heinous, atrocious or cruel; and (3) continuing threat. The evidence supported the ag-

**86.** Vol. XIV O.R. at 2574 (emphasis added).

**87.** 1997 OK CR 28, 939 P.2d 1, 14.

**88.** 1996 OK CR 36, 928 P.2d 309, 318.

**89.** 1995 OK CR 67, 908 P.2d 268, 278.

**90.** *Paxton v. State*, 1993 OK CR 99, 867 P.2d 1309, 1322–23. *But see Paxton*, 867 P.2d at 1334–36 (Chapel, dissenting).

**91.** *Mayes v. State*, 1994 OK CR 44, 887 P.2d 1288, 1316.

**92.** *But see Mayes v. State*, 887 P.2d at 1325 (Chapel, dissenting).

gravating circumstances. Upon review of the record, we cannot say the sentence of death was imposed because the jury was influenced by passion, prejudice, or any other arbitrary factor contrary to 21 O.S.1991, § 701.13(C). Finding no error warranting modification, the judgments and sentences of Creek County District Court are **AFFIRMED**.

## Decision

¶ 71. The Judgments and Sentences for First Degree Murder are **AFFIRMED**.

CHAPEL, P.J., concur in part/dissent in part

STRUBHAR, V.P.J., LANE and JOHNSON, JJ., concur.

LUMPKIN, J., concur in results.

CHAPEL, P.J., concurring in part and dissenting in part:

¶ 1 A majority of the Court today approves the execution of a mentally retarded man who has the mental age of an eight-year-old boy. The Court blithely rejects the claim that the execution of the mentally retarded violates our state and federal constitutions. In deciding to allow the killing of mentally retarded citizens, the majority swallows all sense of decency, disregards the will of the people of Oklahoma and ignores the principles and values of Article II, section 9 of the Oklahoma Constitution.[1] Because our State constitution will not tolerate the execution of a mentally retarded man, I respectfully dissent to the imposition of the death penalty in

this case.[2] I concur in affirming Robert Wayne Lambert's convictions, but I would modify the sentences to life without the possibility of parole and order the sentences to run consecutively.

¶ 2 Although he is a grown man, Lambert cannot make change. He spells no better than a seven year old and reads at a third grade level. When Lambert was seventeen years old, the Oklahoma Juvenile Services Division tested him. The State's testing revealed that Lambert has an IQ of 68 and that he is mentally retarded. Prior to this testing, Lambert struggled through special education classes. Lambert barely managed to get through kindergarten. Finally he dropped out of school when he was in the seventh grade. Lambert was never able to function successfully in a school setting, and after he dropped out of school, his mental retardation limited his ability to work or survive in the outside world. Lambert's entire life has been shaped by his mental retardation. Although he is now thirty years old, he has the mental age of an eight year old. His thinking and reasoning are equivalent to that of a child in the second or third grade. His moral culpability is, of necessity, on the same level.

¶ 3 At issue is not whether Robert Wayne Lambert should be punished for his actions; he should. The question is how we as a society should punish the mentally retarded. The answer to this question speaks volumes about us as civilized, decent people. The majority's answer is shameful.

¶ 4 Oklahoma does not execute children[3]

---

**1.** Article II, section 9 of the Oklahoma Constitution prohibits cruel or unusual punishment.

**2.** Courts and judges are often criticized for "legislating" or making "sociological" decisions. Usually such criticism comes from extreme political factions or other persons ignorant of our system of government. When, however, a judge is presented with a properly raised justiciable issue, it is his or her duty to decide that issue in accordance with the law. In this case we are squarely presented with the issue of whether or not the imposition of the death penalty on a mentally retarded person violates the Eighth Amendment to the United States Constitution or Art. 2, § 9 of the Oklahoma Constitution. The issue is properly raised, and we must decide it.

Certainly, a judge might come down on either side of the issue; he might decide it wrongly, but he must decide. To suggest that the issue in today's opinion can or ought to be decided by the legislature, while politically correct in some circles, is patently absurd. The legislature cannot determine the constitutionality of its own acts. In our system, the constitutionality of legislative acts can only be determined by the courts. *See Marbury v. Madison*, 1 Cranch 137, 5 U.S. 137, 2 L.Ed. 60.

**3.** *Thompson v. Oklahoma*, 487 U.S. 815, 837, 108 S.Ct. 2687, 2700, 101 L.Ed.2d 702 (1988) (Eighth Amendment prohibits execution of person who is under age of sixteen at time of commission of crime).

or the insane [4] because to do so would violate our common, evolving sense of decency.[5] It is incompatible with this sense of decency and it is morally indefensible then to kill someone who thinks, reasons and operates at the level of a third grader. Executing such a man is comparable to executing an eight year old boy.

¶ 5 The Diagnostic and Statistical Manual of Mental Disorders (1994) (DSM–IV) [6] defines a mentally retarded individual as one whose disability manifests itself before age eighteen and who has "significantly subaverage intellectual function," i.e., an IQ below seventy, accompanied with "significant limitations in adaptive functioning." [7] Unlike mental illness,[8] mental retardation is a permanent developmental condition marked by low intellectual capacity. This low intelligence affects and limits the mentally retarded person's ability to think, plan and function. It cannot be ameliorated by drugs or psychotherapy, although the mentally retarded individual may be taught skills and strategies to better function in society. In contrast to mental illness, the likelihood of "faking" mental retardation is minimal.

¶ 6 Oklahoma recognizes the unique niche that the mentally retarded occupy in our society and in Title 10 of the Oklahoma Statutes the State provides institutional care for mentally retarded persons who have a mental age not above that of an average nine year old.[9] Oklahoma recognizes that it needs to step in and provide care and assistance to the mentally retarded. Today, the Court sanctions killing these same individuals.

¶ 7 In choosing to allow the execution of the mentally retarded, the majority relies on *Penry v. Lynaugh*,[10] in which the United States Supreme Court held that the federal constitution requires states to allow a defendant to introduce evidence of his mental retardation as a factor mitigating against the imposition of the death penalty. However, the Court refused to bar completely the execution of the mentally retarded under the federal constitution.[11] At the time the Supreme Court decided *Penry*, only the federal government and two states prohibited the execution of the mentally retarded. Even under those circumstances, four Supreme Court justices believed that the Eighth Amendment barred outright the execution of the mentally retarded. Justice O'Connor, who authored the plurality opinion, was unwilling to go that far concluding that she could not say that at that time there existed a national consensus barring the execution of the mentally retarded. However, Justice O'Connor noted that the Court's position could well change should a national consensus to ban the execution of the mentally retarded emerge.

4. *Ford v. Wainwright*, 477 U.S. 399, 410, 106 S.Ct. 2595, 2602, 91 L.Ed.2d 335 (1986) ("Eighth Amendment prohibits the State from inflicting the penalty of death upon a prisoner who is insane"). See 22 O.S.1991, § 1005 *et seq.*

5. *Trop v. Dulles*, 356 U.S. 86, 100–01, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958) (plurality opinion) (stating that "the words of the [Eighth] Amendment are not precise and their scope is not static. The Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society").

6. Put out by the American Psychiatric Association, this treatise is recognized as the most comprehensive classification and reference manual on mental disorders, their manifestations and treatment.

7. DSM–IV at 39.

8. For a discussion on the differences between mental illness and mental retardation see Ellis & Luckasson, *Mentally Retarded Criminal Defendants*, 53 Geo. Wash. L.Rev. 414, 422–26 (1985) (hereinafter *Mentally Retarded Criminal Defendants*).

9. 10 O.S.1991, § 1414 provides: Mentally retarded persons who are legal residents of this state and who have a mental age not above that of the average nine-year-old child ... may be admitted to an institution ... or provided community services ... Other mentally retarded persons who are residents of this state and who are above such mental age may be admitted or provided community services ... upon recommendation of the superintendent of the institution and approval of the Director.

10. 492 U.S. 302, 340, 109 S.Ct. 2934, 2958, 106 L.Ed.2d 256 (1989) (plurality opinion).

11. Of course, the United States Supreme Court did not and could not speak to this issue under the Oklahoma Constitution. Only this Court can answer the question of whether the execution of the mentally retarded violates the Oklahoma Constitution.

242

¶ 8 Since *Penry* the national landscape has changed dramatically. Ten more states have banned the execution of the mentally retarded.[12] Now, twelve death penalty states, the federal government and thirteen non-death penalty jurisdictions[13] ban the execution of the mentally retarded. New Hampshire has not imposed the death penalty on anyone since 1976. Missouri currently has legislation pending to bar the execution of mentally retarded persons.[14]

¶ 9 Other states, while not explicitly banning the execution of mentally retarded persons, prohibit the execution of persons with limited mental abilities. For example, Connecticut provides, "The court shall not impose the sentence of death on the defendant if ... at the time of the offense ... his mental capacity was significantly impaired or his ability to conform his conduct to the requirements of law was significantly impaired but not so impaired in either case as to constitute a defense to prosecution."[15] California also provides "evidence of diminished capacity or of a mental disorder may be considered by the court ... at the time of sentencing or other disposition or commitment."[16] Courts have overturned or modified death sentences in part because of a defendant's mental retardation.[17]

12. Ark.Code Ann. § 5–4–618(b) (Michie 1993) ("No defendant with mental retardation at the time of committing capital murder shall be sentenced to death"); Colo.Rev.Stat. § 16–9–403 (Supp.1994) ("A sentence of death shall not be imposed upon any defendant who is determined to be a mentally retarded defendant pursuant to section 16–9–402. If any person who is determined to be a mentally retarded defendant is found guilty of a class 1 felony, such defendant shall be sentenced to life imprisonment"); Ga. Code Ann. § 17–7–131(j) (1990 & Supp.1994) ("In the trial of any case in which the death penalty is sought which commences on or after July 1, 1988, should the judge find in accepting a plea of guilty but mentally retarded or the jury or court find in its verdict that the defendant is guilty of the crime charged but mentally retarded, the death penalty shall not be imposed and the court shall sentence the defendant to imprisonment for life"); Ind.Code Ann. § 35–36–9–6 (West Supp.1994) ("If the court determines that the defendant is a mentally retarded individual under section 5 of this chapter, the part of the state's charging instrument filed under IC 35–50–2–9(a) that seeks a death sentence against the defendant shall be dismissed."); Kan. Stat. Ann. § 21–4623(d) (Supp.1994) ("If, at the conclusion of a hearing pursuant to this section, the court determines that the defendant is mentally retarded, the court shall sentence the defendant as otherwise provided by law, and no sentence of death shall be imposed hereunder"); Ky.Rev. Stat. Ann. § 532.140 (Michie 1990) ("no offender who has been determined to be a seriously mentally retarded offender under the provisions of KRS 532.135, shall be subject to execution"); Md.Code Ann. Art. 27, § 412(g)(1) (1992) ("If a person found guilty of murder in the first degree was, at the time the murder was committed, less than 18 years old or if the person establishes by a preponderance of the evidence that the person was, at the time the murder was committed, mentally retarded, the person shall be sentenced to imprisonment for life or imprisonment for life without the possibility of parole and may not be sentenced to death"); Neb.Rev.Stat. §· 28–105.01(2) (1997) ("Notwithstanding any other

provision of law, the death penalty shall not be imposed upon any person with mental retardation"); N.M. Stat. Ann. § 31–20A–2.1(B) (Michie 1994) ("The penalty of death shall not be imposed on any person who is mentally retarded"); N.Y.Crim. Proc. Law § 400.27(12) (1995) ("In the event the defendant is sentenced pursuant to this section to death, the court shall thereupon render a finding with respect to whether the defendant is mentally retarded. If the court finds the defendant is mentally retarded, the court shall set aside the sentence of death and sentence the defendant either to life imprisonment without parole or to a term of imprisonment for the class A–I felony of murder in the first degree other than a sentence of life imprisonment without parole"); Tenn.Code Ann. § 39–13–203(b) (1991 & Supp.1994) ("Notwithstanding any provision of law to the contrary, no defendant with mental retardation at the time of committing first degree murder shall be sentenced to death"); Wash. Rev.Code Ann. § 10.95.030(2) (West Supp.1995) ("In no case, however, shall a person be sentenced to death if the person was mentally retarded at the time the crime was committed").

13. These jurisdictions include twelve states and the District of Columbia.

14. Missouri SB 1288 (1998). In addition, on Sept. 29, 1995, Missouri Governor Mel Carnahan pardoned a mentally retarded man who had been on death row for eight-and-a-half years after evidence emerged showing the man was innocent. *Protecting the Mentally Retarded from Capital Punishment: State Efforts Since Penry and Recommendations for the Future*, 22 N.Y.U. Rev. L. Soc. Change 59, 61 (1996).

15. Conn. Gen.Stat. § 53a–46a(h) (1997).

16. Ca. Penal Code § 25.

17. *See, e.g., Hadley v. Alabama*, 575 So.2d 145 (Ala.Crim.App.1990); *Arizona v. Jimenez*, 165

¶ 10 As evidenced by state and federal legislation as well as public opinion polls,[18] the American people disfavor executing the mentally retarded. A majority of Oklahomans oppose the imposition of the death penalty on mentally retarded defendants.[19] The American Bar Association and the American Association of Mental Retardation recommend banning the execution of mentally retarded persons. Thus, while the death penalty continues to be an accepted form of punishment, the execution of the mentally retarded is out of step with the values of society.

¶ 11 The growing ban on the execution of the mentally retarded has much in common with the ban on the execution of two other traditionally protected groups: children and the insane. The rationale for barring the execution of children was set out in *Thompson v. Oklahoma*.[20] Of great importance to the *Thompson* Court was the fact that under Oklahoma law children were treated differently from adults. The Court was also swayed by the eighteen states that specifically required that persons be at least sixteen years old to be eligible for the death penalty[21] and by the American Bar Association's recommendation that children be exempt from the death penalty. In barring the execution of the insane, the United States Supreme Court had a visceral reaction against the execution of such persons finding that the execution of the insane offended humani-

ty and constituted a barbaric act of "exacting mindless vengeance."[22]

¶ 12 The same concerns and interests involved in the ban on the execution of children and the insane are at issue in the execution of the mentally retarded. Oklahoma provides extra-protection and treats mentally retarded persons differently from non-mentally disabled persons, as evidenced by Title 10 of Oklahoma Statutes. Every caring human being experiences a visceral reaction of revulsion at the thought of executing an individual whose social and mental abilities are no greater than that of an eight year old boy. Indeed, because of the society's protective role over the mentally retarded, the systemic execution or extermination of the mentally disabled is a crime against humanity that fills one with shock and horror.[23] The repugnance evoked by the image of executing the mentally retarded is evidenced by the growing consensus of states, citizens and professional organizations that now ban or urge the banning of the execution of the mentally retarded.

¶ 13 As the State of New York noted when it exempted the mentally retarded from the death penalty, the execution of the mentally retarded fails to serve the penological goals of retribution or deterrence, which underpin and justify the imposition of the death penalty.[24] The heart of retribution is that "a criminal sentence must be directly related to the personal culpability of the criminal of-

Ariz. 444, 799 P.2d 785 (1990); *Brown v. Florida,* 526 So.2d 903 (Fla.1988), *cert. denied,* 488 U.S. 944, 109 S.Ct. 371, 102 L.Ed.2d 361 (1988).

**18.** *See* D.W. Keyes & W.J. Edwards, *Mental Retardation and the Death Penalty: Current Status of Exemption Legislation,* American Bar Association (1997).

**19.** *Id.* at 2, 2n.15.

**20.** 487 U.S. 815, 108 S.Ct. 2687, 101 L.Ed.2d 702 (1988).

**21.** It should be noted that sixteen was the lowest age allowed by statute. Many states and the federal government bar the execution of anyone who is eighteen at the time they committed the crime.

**22.** *Ford v. Wainwright,* 477 U.S. 399, 409–10, 106 S.Ct. 2595, 2602, 91 L.Ed.2d 335 (1986).

**23.** This repugnance was evident in the Nuremburg trials, which prosecuted war criminals for executing the mentally retarded as well as for other war crimes and crimes against humanity.

**24.** In reinstating the death penalty in *Gregg v. Georgia,* 428 U.S. 153, 182–83, 96 S.Ct. 2909, 2929–30, 49 L.Ed.2d 859 (1976), the Supreme Court stated:

Although we cannot "invalidate a category of penalties because we deem less severe penalties adequate to serve the ends of penology," the sanction imposed cannot be so totally without penological justification that it results in gratuitous infliction of suffering.

The death penalty is said to serve two principle social purposes: retribution and deterrence of capital crimes by prospective offenders.

fender."[25] "Among the mentally retarded, 'reduced ability is found in every dimension of the individual's functioning, including his language, communication, memory, attention, ability to control impulsivity, moral development, self-concept, self-perception, suggestibility, knowledge of basic information, and general motivation.'"[26] Mentally retarded individuals have limited reasoning powers and are highly impulsive.[27] They are far less likely to understand or foresee the consequences of their actions.[28] These fundamental and immutable characteristics compel the conclusion that mentally retarded citizens, like children, lack the moral culpability to subject them to the ultimate penalty of death, even though they may be subject to other severe punishments such as life imprisonment or life imprisonment without the possibility of parole. The execution of the mentally retarded "is ... 'nothing more than the purposeless and needless imposition of pain and suffering.'"[29]

¶ 14 Moreover, due to the restricted thinking and reasoning powers of the mentally retarded, it is highly unlikely that the threat of the death penalty would have any deterrent effect. A mental retarded person, whose ability to engage in abstract thinking is minimal, at best, will have great difficulty in comprehending his own execution. It is unlikely then that the threat of this punishment will deter capital crime any more than the execution of children or the insane will operate as a deterrent.

¶ 15 The Oklahoma Constitution bars "cruel or unusual punishments."[30] It is our duty to interpret and enforce the Oklahoma Constitution. Given Oklahoma's traditional protection of the mentally retarded, the growing national ban on the execution of the mentally retarded, and the lack of penological goals advanced by the execution of these individuals, I believe the execution of the mentally

retarded is a cruel or unusual punishment prohibited under Oklahoma law. I therefore respectfully dissent to the execution of a mentally retarded man who has the mental age of an eight-year-old boy.

LUMPKIN, Vice Presiding Judge, concur in the results:

¶ 1 I concur in the results reached by the Court both as to the affirmance of the conviction and the judgment rendered as to the sentence.

¶ 2 I dissented to the vacation of the murder convictions and sentences of death in the original *Lambert* appeal. *Lambert v. State,* 888 P.2d 494, 507 (Okl.Cr.1994). Therefore, I wholeheartedly agree with the affirmance of the murder convictions and sentence of death in this opinion. However, I am not sure the Court's explanation of why it can vacate the convictions for the underlying felonies is totally correct. I did not amplify all the problems I had with the wording of the original opinion in my separate vote in that case. Now I believe some of that terminology needs to be discussed.

¶ 3 I have failed to find authority for a trial court to legally "abrogate" a conviction which has been affirmed on appeal by a court of last resort. The only way a trial court reacquires jurisdiction and is empowered with authority to vacate an already final conviction in Oklahoma is through the Post–Conviction Relief Act. *See* 22 O.S.Supp.1995, § 1080, et seq. That act is not applicable to the fact situation in this case. In attempting to explain away this problem, the Court uses *Greenwood v. State,* 381 P.2d 895 (Okl.Cr. 1963) as authority for the trial court to take this action as a part of our mandate. However, a reading of *Greenwood* reveals its holding is in direct contradiction to what the opinion seeks to use as authority. In fact,

---

**25.** *Tison v. Arizona,* 481 U.S. 137, 149, 107 S.Ct. 1676, 1683, 95 L.Ed.2d 127 (1987).

**26.** *Penry,* 492 U.S. at 345, 109 S.Ct. at 2961 (J. Brennan dissenting) (citation omitted).

**27.** *Mentally Retarded Criminal Defendants,* at 427–32.

**28.** *Id.*

**29.** *Thompson,* 487 U.S. at 838, 108 S.Ct. at 2700.

**30.** Okl. Const. Art. 2, § 9. In contrast, the Eighth Amendment of the federal constitution bars the imposition of "cruel *and* unusual punishments." (emphasis added) *See Dodd v. State,* 1994 OK CR 51, 879 P.2d 822 (Chapel, concurring in part and dissenting in part).

the Court in *Greenwood* cites to *Reed v. State*, 10 Okl.Cr. 444, 137 P. 369 (1914) for the following statement of law:

> After a case has been affirmed on appeal to the Criminal Court of Appeals, and is sent back to the trial court, the trial court has no power to set aside said judgment, but it must be carried into execution as directed by this Court; otherwise the enforcement of criminal law in Oklahoma would be involved in endless confusion.

Following that citation to *Reed*, the Court then addresses the issue in *Greenwood* and states:

> [i]t is, therefore, the opinion of this Court that the trial court was without jurisdiction to vacate the original orders (most particularly the judgment and sentence) and allow new ones to be issued, based on the cases and authorities cited above.

381 P.2d at 898. While 22 O.S.1991, § 1066, does provide "the appellate court may reverse, affirm or modify the judgment or sentence appealed from . . .", I have been unable to find authority for the application of that statute to vacate a judgment and sentence which has already been affirmed. However, I agree with the Court's discussion of continuing jurisdiction in this case and concur in the results as to the vacation of the underlying felonies of robbery with a dangerous weapon.

¶ 4 I have also reviewed the application for evidentiary hearing and find it contains only speculations, not evidence. Appellant has failed to show this Court by clear and convincing evidence, the materials sought to be introduced have or are likely to have support in law and fact to be relevant to an allegation raised in this appeal. The record on appeal in this case regarding the issue of change of venue as it related to media coverage contradicts the suppositions alleged in the application for evidentiary hearing. Therefore, the threshold showing has not been made for purposes of warranting an evidentiary hearing on this issue.

¶ 5 My colleague's empathy for the plight of the Appellant in this case is commendable. On a human plane, each of us is touched and saddened when we must witness the fruits of human tragedy, as well as the human imperfections which caused that tragedy. However, ours is a court of law which is bound to enforce the rule of law and apply it equally under established standards. Applying the rule of law requires adherence to these standards, even in those times we might wish from the human plane to be able to in some way change its application in a particular situation.

¶ 6 Rather than making a sociological decision which would completely disregard the concept of separation of powers, we must follow and apply the law which is applicable at this time in this state. My colleague seeks a constitutional justification for modifying the sentence in this case based on Appellant's level of mental retardation. However, this is an issue which is a matter for legislative determination. Each of the instances related in his separate vote reflects a state legislature in each of the respective jurisdictions which has made a public policy decision on this issue. The United States Supreme Court has already ruled the execution of a person with mental retardation is not a violation of the Federal Constitution. As noted, the United States Supreme Court decision in *Penry v. Lynaugh* is still controlling precedent. The Court said in that case:

> [s]o long as sentencers can consider and give effect to mitigating evidence of mental retardation in imposing sentence, an individualized determination of whether 'death is the appropriate punishment' can be made in each particular case. While a national consensus against execution of the mentally retarded may someday emerge reflecting the 'evolving standards of decency that may mark the progress of a maturing society,' there is insufficient evidence of that consensus today.

492 U.S. 302, 340, 109 S.Ct. 2934, 2958, 106 L.Ed.2d 256 (1989). Even though the United States Supreme Court may at some time in the future decide to consider a "national consensus" as it seeks to decide questions of law, I do not believe it is the function of this Court to make decisions based on public opinion polls or merely what other states have done. Our duty is to follow the law as our Constitution specifically sets out and as

the Oklahoma Legislature speaks in establishing the policy for the citizens of this state.

¶ 7 Specifically, facts reveal Appellant's diagnosis of a sixty-eight (68) I.Q. indicates a higher level of functioning than that of Penry, who was tested over the years as having an I.Q. of between fifty (50) and sixty-three (63). The following statement in *Penry* applies equally to Lambert:

> Penry was found competent to stand trial. In other words, he was found to have the ability to consult with his lawyer with a reasonable degree of rational understanding, and was found to have a rational as well as factual understanding of the proceedings against him. (cite omitted).

492 U.S. at 333, 109 S.Ct. at 2954–55.

¶ 8 Recently, the Texas Court of Criminal Appeals addressed this same issue in *Bell v. State*, 938 S.W.2d 35 (Tex.Cr.App.1996). In that case, Bell argued that "because ten states have passed legislation banning execution of mentally retarded individuals, there is a growing 'national consensus' against such executions." As the Texas court stated, the appellant in that case did not discuss any of those statutes and pointed to no relevant caselaw from Texas or other states. The Texas court stated:

> As appellant acknowledges, the United States Supreme Court in *Penry v. Lynaugh*, 492 U.S. at 335–38, 109 S.Ct. at 2955–57, held that the Eighth Amendment does not preclude execution of mentally retarded persons. 'So long as sentencers can consider and give effect to mitigating evidence,' the Court explained, 'an individualized determination of whether 'death is the appropriate punishment' can be made in each particular case.' *Id.* Although appellant introduced a great deal of mental retardation evidence at his trial, the jury chose not to give ·it sufficient weight to mitigate against imposition of the death penalty.

This Court addressed appellant's claim in *Penry v. State, supra*, and held that because the jury was able to give mitigating weight to Penry's mental retardation evidence, his death sentence did not violate the Eighth Amendment. 903 S.W.2d at 766–767. Likewise, we hold that appel-

lant's sentence does not violate the Eighth Amendment and overrule appellant's twenty first point of error.

938 S.W.2d at 55. Bell sought certiorari with the United States Supreme Court in that case, on the very issue presented here, and it was denied in October 1997. 522 U.S. 827, 118 S.Ct. 90, 139 L.Ed.2d 46 (1997). Therefore, as recently as October 1997, the United States Supreme Court was presented with this very issue in a Petition for Certiorari in Bell's case and chose not to further amplify or modify its decision in *Penry*.

¶ 9 While my colleague's syntax seeks to tug at the heartstrings for the plight of the mentally retarded, and each of us would have empathy for those individuals as persons, that empathy does not allow us to subvert the legislative process. Matters of public policy and the values of society are to be decided by our legislative bodies through appropriate public hearings and true determination of what the public desires as public policy. That is a proper function of the legislature in our republic, as each member represents his or her constituents and votes on legislation based on decisions made in committees after public input and open discussion on the floor of the House and Senate. In this case the law as enacted by the Legislature, is to be enforced by the Executive branch and interpreted, as well as applied, by the Judicial branch. This cooperative triumvirate ensures the continuation of an ordered society and a threshold of moral values established through our statutes defining and prohibiting criminal conduct, together with a multitude of other statutes requiring or prohibiting conduct.

¶ 10 Today, the only public policy we are to apply is what is in our statutes. The statutes which are applicable to this case provide the death penalty is an appropriate punishment under the procedures set out. The legislature has defined as a matter of public policy those aggravating circumstances which allow the death penalty to be considered for the crime of murder in the first degree. Our statutes only provide that execution is prohibited for those individuals who are insane. *See* 22 O.S.1991, §§ 1005, 1008. *See also, Medlock v. State* 927 P.2d 1069, 1072 (Okl.Cr.

1996). In addition, in 1998, the Oklahoma Legislature amended the language of section 152(3) of Title 21 to provide the following:

All persons are capable of committing crimes, except those belonging to the following classes: ... 3. Persons who are impaired by reason of mental retardation upon proof that at the time of committing the act charged against them they were incapable of knowing its wrongfulness; ....

The Legislature has also provided the protections of our competency statutes, which Appellant utilized at each trial of this case to ensure his competency to stand trial, and included the requirement for the trier of fact to answer the question "is the person mentally ill, mentally retarded, or a person requiring treatment as defined by Section 3 of Title 43A?" *See* 22 O.S.1991, § 1175.5. That determination has been made and affirmed in this case. The record in this case reflects that determination of Appellant's ability to distinguish right from wrong has been made by a trier of fact and according to our law, and the issue of mental retardation was also presented to the jury as a mitigating factor. The jury in this case for a second time has determined that mitigating factor was not sufficient to overcome the proof of the aggravators in this horrific crime.

¶ 11 The issue before us is not an issue of constitutional magnitude, but one of public policy. Public policy is to be determined by the legislative and executive branches of government. The judicial branch of government, especially a court sitting only in review of appeals from criminal cases, is ill-equipped to make any determination of public policy. Historically, each time appellate courts have ventured into the public policy forum and disregarded the rule of law, it has resulted in not only turmoil, but a denigration of the respect of the judicial system and the rule of law. *See e.g. Dred Scott v. Sandford,* 60 U.S. 393, 19 How. 393, 15 L.Ed. 691 (1857); *Plessy v. Ferguson,* 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896); *Lochner v. People of State of New York,* 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905); and *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973).

This Court has correctly decided it should not make that same type of mistake here.